# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

James R. Booker,                                    Civil No. 08-5346 (PAM/SRN)

        Plaintiff,

     v.                                             **AMENDED REPORT AND
                                                   RECOMMENDATION**

Michael J. Astrue, Commissioner
 of Social Security,

        Defendant.

---

     Gerald Weinrich, Esq., Weinrich Law Office, 400 South Broadway, Suite 203, Rochester, Minnesota, 55904, for Plaintiff.

     Lonnie Bryan, Esq., United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Defendant.

---

SUSAN RICHARD NELSON, United States Magistrate Judge

     Pursuant to 42 U.S.C. § 405(g), Plaintiff James R. Booker seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who denied Plaintiff's application for disability insurance benefits. Both parties have filed motions for summary judgment, [Docket Nos. 8 and 12], and the motions have been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and District of Minnesota Local Rule 72.1. For the reasons set forth below, the Court recommends that Plaintiff's motion be denied and Defendant's motion be granted.

# I.  BACKGROUND

## A.  PROCEDURAL HISTORY

Plaintiff James Booker applied for disability insurance benefits and supplemental security income (SSI) on August 26, 2003, with a protective filing date of June 19, 2003. (Admin. R. at 81-84, 766-69). He alleged a disability onset date of March 3, 2003, due to chronic disc disease in his spine, chronic low back pain, chronic abdominal pain secondary to scaring from multiple surgeries including gastric by-pass, arthritis in the hands and knees, asthma and/or chronic obstructive lung disease (COPD), fibromyalgia, chronic pain syndrome, coronary artery disease, seizures, severe allergies, and chronic dermatitis. (Id.). The applications were denied initially and upon reconsideration. (Id. at 770-72). Plaintiff requested a hearing before an Administrative Law Judge (ALJ), which was held before ALJ Roger W. Thomas on May 5, 2005. (Id. at 581-88). On July 23, 2005, ALJ Thomas issued an unfavorable decision. (Id. at 578-88). The Appeals Council then vacated the decision of the ALJ and remanded the matter for further administrative proceedings on June 14, 2006. (Id. at 594-98). A second hearing was held before ALJ Mary M. Kunz on December 22, 2006 and continued on May 1, 2007. (Id. at 19-33). ALJ Kunz issued an unfavorable decision on June 29, 2007. (Id. at 16-33). The Appeals Council denied a request for further review on August 6, 2008. (Id. at 11-14). The denial of review made ALJ Kunz's decision the final decision of the Commissioner. See 42 U.S.C. § 405(g); Clay v. Barnhart, 417 F.3d 922, 928 (8th Cir. 2005); Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992).

### B. PLAINTIFF'S TESTIMONY

Plaintiff was born in 1956 and completed high school and some college courses during high school. (<u>Id.</u> at 844). Plaintiff has past work experience as a computer technician, security guard, and a casino employee. (<u>Id.</u> at 845). In describing his back and neck pain, Plaintiff reported that his pain was constant and it resulted in sleeping difficulties and corresponding loss of concentration. (<u>Id.</u> at 846). Laying down or shifting positions sometimes helped alleviate Plaintiff's pain. (<u>Id.</u>). Prolonged sitting, standing and walking aggravated his back pain. (<u>Id.</u> at 847). Because of the pain, Plaintiff testified that he could sit for approximately 15 minutes, stand for 15-20 minutes, and walk for 50 feet. (<u>Id.</u> at 847-48). Plaintiff's walking difficulties were further impacted by his plantar fasciitis. (<u>Id.</u> at 860). At the time of the hearing, Plaintiff used a cane to assist him in walking but testified he could walk without the cane. (<u>Id.</u> at 848). Plaintiff also reported difficulties sleeping because of restless leg syndrome. (<u>Id.</u> at 849). These sleeping difficulties caused Plaintiff to sleep three or four hours during an average day. (<u>Id.</u>).

Because of his allergies and dermatitis, Plaintiff reported that he always wore cotton gloves. (<u>Id.</u> at 849-50). The use of the gloves prevented Plaintiff from performing computer work because of electro-static discharge to the computer components. (<u>Id.</u> at 850). Plaintiff's allergies would flare-up from breathing fumes in the air and from touching things to which he was allergic. (<u>Id.</u>). As a result, Plaintiff's throat would swell up and he would break out in hives. (<u>Id.</u>). If Plaintiff came into contact with metal, such as coins, his hands would break out in a rash, crack, itch and ooze. (<u>Id.</u> at 868). Because of the allergies, Plaintiff carried and sometimes used an epi-pen (epinephrine). (<u>Id.</u> at 850-51). Occasionally, Plaintiff visited the emergency room for his allergic reactions but often did not because doctors told him not to come to the hospital unless his reaction was severe. (<u>Id.</u> at 851).

Because of pain and inflammation in his hands, Plaintiff stated he had difficulties opening jars and gripping things such as cans and bottles. (Id. at 852-53). Plaintiff reported that he had difficulties with buttons and zippers a couple of times a week but could grasp plastic silverware and his cane. (Id. at 853-54). Because of pain in his knees, Plaintiff testified that he fell down approximately five times per month. (Id. at 856-57). At the hearing, Plaintiff told the ALJ he experienced severe neck pain which prevented him from turning his head. (Id. at 857). The limited range of motion in Plaintiff's neck also prevented him from driving. (Id.). Plaintiff also explained that he experienced pain and stiffness if he looked down and kept his neck in a fixed position. (Id. at 870).

Plaintiff testified that he experienced diarrhea, approximately 20-25 times per day. (Id. at 855). In 2004, Plaintiff was hospitalized for dehydration resulting from the diarrhea, but had not had dehydration problems since that time. (Id. at 856). With respect to mental impairments, Plaintiff stated that he had problems with concentration resulting from depression, "brain atrophy," and age. (Id. at 859). Additionally, Plaintiff reported that he had pain from scars on his abdomen, stating "my stomach is like a war zone and it just kills." (Id. at 862).

Regarding his daily activities, Plaintiff testified he was able to go grocery shopping if he used a motorized cart and he could fix simple meals for himself. (Id. at 863). While Plaintiff's wife and step-son did the majority of the cooking, cleaning and laundry, Plaintiff reported he did some house-cleaning, such as vacuuming for short periods of time and cleaning the bathrooms. (Id. at 863-64, 866, 869). Plaintiff also listened to music, watched TV and movies, played on the internet, and visited with friends. (Id. at 802, 867-68).

## C.    MEDICAL EVIDENCE IN THE RECORD[1]

### 1.    Evidence Predating Disability Onset Date

Dr. John Ouellette at the University of Wisconsin Hospitals and Clinics, performed allergy tests on Plaintiff in February 2003. (Id. at 147-149, 357). At the testing, Plaintiff reported that he experienced hives, itching, redness, blotchiness and skin cracking when coming into contact with certain substances. (Id. at 148, 150). Dr. Ouellete concluded Plaintiff should avoid nickel, chromium, fragrance, parabens, cobalt, paraphenylenediamine, quaternium, black rubber, milk, formaldehyde, and thimerosal. (Id. at 148, 152). In a letter to the physician who referred Plaintiff, Dr. Ouellette opined that Plaintiff was "extremely allergic" and had contact dermatitis.[2] (Id. at 152-53). On March 5, 2003, Dr. Ouellette wrote a letter regarding Plaintiff's allergies for worker's compensation purposes stating he believed Plaintiff's allergies to be work-place related and would result in Plaintiff "temporarily" being out of the workplace. (Id. at 151). At that time, Plaintiff worked as a security guard at Ho-Chunk casino and he was required to handle a lot of money and was not allowed to wear gloves. (Id. at 152).

### 2.    Medical Records Between the Onset Date and the ALJ's Decision

Plaintiff returned to the University of Wisconsin Allergy, Asthma, and Immunology department on March 17, 2003 and treated with Dr. Marcus Cohen. (Id. at 351). For his allergies, Plaintiff was taking Prednisone, Zyban, and Benadryl. (Id. at 351-52). Plaintiff's skin dermatitis had flared-up when he returned to work at the casino, but was resolving since he had

---

[1]  Plaintiff received treatments for certain temporary conditions unrelated to his allegedly disabling impairments (i.e. prostatitis, pneumonia, dental surgery). Medical treatment for these conditions will not be discussed in this Report and Recommendation, unless those medical records discussed or related to one of Plaintiff's allegedly disabling impairments. Additionally, Plaintiff did not challenge the ALJ's RFC with respect to limitations caused by Plaintiff's chronic diarrhea. Medical records relating to Plaintiff's diarrhea/dumping syndrome will likewise not be summarized in this Report and Recommendation.
[2]  Contact dermatitis is a hypersensitivity resulting from skin contact with a specific allergen or irritant. Stedman's Medical Dictionary, Dermatitis, Contact Dermatitis (27th Ed. 2000).

left the work environment. (Id. at 351). The results of Dr. Cohen's physical examination were normal. (Id. at 351). As a result, Dr. Cohen instructed Plaintiff to start tapering off the Prednisone, to use Vanicream as a moisturizer to lubricate his hands, to use an albuterol inhaler if he had difficulties breathing, and to avoid exposure to metal and Plaintiff's other allergens. (Id. at 352).

Dr. Wayne Kelly, a physician at the Family Medicine of Winona clinic, treated Plaintiff for a cough and congestion on March 30, 2003. (Id. at 177). At the examination, Dr. Kelly prescribed an increased dose of Plaintiff's Prednisone and told Plaintiff to continue with the Advair Diskus and Doxy. (Id.). Additionally, Dr. Kelly recommended Plaintiff stop smoking. (Id.).

Experiencing a cough and congestion, Plaintiff saw Dr. Morales at the Emergency Room of Community Memorial Hospital on April 9, 2003. (Id. at 275-77). Plaintiff's symptoms included a cough, trouble breathing, sore chest and throat, runny nose, sinus pain, an ear ache, and he reported fever and chills. (Id. at 276). An x-ray of Plaintiff's chest did not reveal any abnormalities. (Id. at 296). Dr. Morales diagnosed bronchitis. (Id. at 277).

Plaintiff returned to Dr. Kelly on May 19, 2003, complaining of a cough. (Id. at 179). At that time, Plaintiff's recent chest x-ray was normal but his pharynx was red and he was wheezing. (Id.). For treatment Dr. Kelly prescribed an antibiotic, Advair Diskus and again recommended Plaintiff quit smoking. (Id.).

Complaining of back and dental pain, Plaintiff went to the Emergency Room at the Community Memorial Hospital on June 12, 2003. (Id. at 272-74). At admission, Plaintiff reported he had twisted his back while walking. (Id. at 273). On physical examination, Plaintiff reported sharp back pain radiating into his legs, frequent urination, fever, chills, headache,

abdominal pain, nausea, vomiting, diarrhea, and bloody stools. (Id.). Plaintiff demonstrated normal range of motion in his neck, but back tenderness. (Id. 274). Dr. Morales diagnosed acute low back pain and acute toothache and prescribed Toradol (NSAID) and Phenergan (anti-nauseate). (Id. at 272).

Once again Dr. Kelly examined Plaintiff for his back pain on June 13, 2003. (Id. at 176). In describing Plaintiff's pain, Dr. Kelly noted "a little" tenderness over the right flank area over the posterior pelvis. (Id.). The results of Dr. Kelly's examination showed normal forward flexion, straight leg raising was negative, and Plaintiff's reflexes and strength were normal. (Id.). For treatment Dr. Kelly prescribed Darvocet (a narcotic pain medication) and back stretches. (Id.).

On June 24, 2003, Plaintiff visited Dr. Kelly for his dermatitis and back pain. (Id. at 175). At that time Plaintiff was experiencing a flare-up of his dermatitis and Dr. Kelly noted the dermatitis was severe. (Id.). While working at a carnival over the weekend, Plaintiff reported he strained his back while helping some children get onto a carnival ride. (Id.). Dr. Kelly stated Plaintiff "[w]ants something for pain basically" and prescribed Ultracet (opiate-type pain reliever). (Id.).

At the next visit, on July 16, 2003, Dr. Kelly treated Plaintiff for his hand dermatitis, chest pain, and foot pain. (Id. at 173-74). Dr. Kelly, in examining Plaintiff's hands, noted Plaintiff did have a scaly dermatitis. (Id. at 173). Consequently Dr. Kelly prescribed a topical cream and suggested Plaintiff "might consider wearing white gloves at nighttime." (Id. at 173). In his treatment notes, Dr. Kelly repeated Plaintiff's report that "the dermatitis is actually disabling and does not allow him to work." (Id.). Besides the dermatitis, Plaintiff reported that he was experiencing occasional sharp chest pains with accompanying nausea. (Id.). The

physical examination showed Plaintiff's chest sounded clear, his heart was regular, and his abdomen was soft and non-tender. (Id.). Dr. Kelly concluded that the chest pain was not cardiac or anginal in nature. (Id. at 174). With respect to Plaintiff's foot pain, Dr. Kelly noted it was proximal to the heel near the arch of the foot, with no deformity and "a little bit" of tenderness. (Id.). Dr. Kelly concluded it "[s]ounds like plantar fasciitis" and prescribed Vioxx (NSAID). (Id.).

Because of his hand rash and tooth pain, Plaintiff went to the Community Memorial Hospital Emergency Room in Winona on July 22, 2003. (Id. at 269-71). The physical examination revealed a rash on Plaintiff's hands and a cracked molar. (Id. at 271). Dr. Bybee diagnosed contact dermatitis and dental pain and prescribed Percocet (narcotic pain reliever), Predisone (steroid), and a topical cream for Plaintiff's hands. (Id. at 269).

Plaintiff, complaining of a back strain, returned to Dr. Kelly on August 26, 2003. (Id. at 172). With respect to Plaintiff's dermatitis, Dr. Kelly noted that Plaintiff's hands were still chapped, cracking and peeling and prescribed a corticosteroid topical cream. (Id.). Dr. Kelly's back examination was "unremarkable," although "forward flexion [was] a little limited." (Id.). At this visit Dr. Kelly prescribed Soma (muscle relaxant). (Id.).

On September 10, 2003, Plaintiff presented to Dr. Kelly with complaints of a headache, dizziness, vomiting, back ache and a cough. (Id. at 171). The physical examination revealed that Plaintiff's chest was clear, his heart regular, and his abdomen was non-tender. (Id.). Based on these findings, Dr. Kelly concluded Plaintiff was suffering from a viral illness and prescribed fluids. (Id.). Additionally, Plaintiff requested a refill of pain medications and Dr. Kelly prescribed Soma and Ultram (a non-narcotic pain medication). (Id.).

Plaintiff, seeking a statement that he was disabled because of his allergies and hand dermatitis, visited Dr. Kelly on September 12, 2003. (Id. at 170). After examining Plaintiff's hands, Dr. Kelly noted "[h]is hands actually look pretty good today. He does have a little bit of scaling and crusting but overall the fissuring and erythema is [sic] down markedly." (Id.). Nevertheless, Dr. Kelly filled out a statement saying Plaintiff was unable to work at that time because of his skin problems. (Id.).

For his plantar fasciitis, on September 18, 2003, Dr. William Hanson treated Plaintiff and prescribed orthotics. (Id. at 206-08).

Dr. Dan Larson, a state agency consultant, completed a residual functional capacity assessment on September 23, 2003. (Id. at 157-64). Based on Plaintiff's impairments of dermatitis, back pain, and obesity, Dr. Larson opined that Plaintiff had the residual functional capacity (RFC) to lift 20 pounds occasionally and ten pounds frequently, stand or walk for two hours and sit for six hours in an eight hour day, with no limitations in pushing or pulling. (Id. at 157-59). Dr. Larson concluded Plaintiff did not have any postural, manipulative, visual, or communicative limitations but he approved an environmental limitation of avoiding exposure to solvents or other substances which would aggravate Plaintiff's dermatitis. (Id. at 159-61). Dr. Larson's assessment was confirmed by Dr. Eunice Davis on November 3, 2003. (Id. at 164).

For his contact dermatitis, on September 19, 2003, Plaintiff was evaluated at the Mayo Clinic Allergy department. (Id. at 528-29). At that time, Plaintiff was treating the dermatitis with topical steroids, Zyrtec, and wearing white cotton gloves. (Id. at 528). Dr. Joseph Butterfield, Plaintiff's allergist, planned to send Plaintiff to dermatology for further evaluation and ordered pulmonary function studies for Plaintiff's COPD. (Id. at 529). Pulmonary lung function tests taken a few days later were normal. (Id. at 536).

For a follow-up consultation, Dr. Butterfield examined Plaintiff on September 25, 2003. (Id. at 527). For the dermatitis, Dr. Butterfield instructed Plaintiff on topical hand care and told him to return to the allergy clinic in one month. (Id. at 527). To treat Plaintiff's itching, Dr. Butterfield prescribed doxepin. (Id.).

On a referral from Dr. Kelly, Plaintiff was first treated by Dr. Mark Martin on October 6, 2003 for chronic low back-pain and neck pain with headaches. (Id. at 252-53). Plaintiff, asserting he had back problems for the past two years, reported that sitting and walking were painful but denied any radiation of the pain into his extremities. (Id. at 253). Dr. Martin, discussing Plaintiff's functional limitations, remarked that Plaintiff "remains independent in all of his [activities of daily living]." (Id.). The physical examination showed Plaintiff ambulated without difficulty but he had difficulties heel and toe walking because of plantar fasciitis. (Id. at 252). With respect to Plaintiff's back, he was able to forward bend to 90 degrees and backward bend to 20 degrees. (Id.). Rotation was slightly limited to the right as compared with the left. (Id.). Dr. Martin's neurological examination did not reveal any weaknesses in the extremities and muscle strength was normal. (Id.). Straight leg raising was negative and there were no Hoffman's, Babinski's or Romberg's signs indicating neurological or reflex problems. (Id.). However, Dr. Martin noted Plaintiff had a positive psoas sign on the right (indicating abdominal pain) and muscle tightness in the lumbosacral spine region. (Id.). X-rays were taken of Plaintiff's spine at that visit and the results were unremarkable. (Id. at 255, 295). Dr. Martin diagnosed: chronic low back pain with elements of somatic dysfunction and pelvic obliquity with hyperlordosis; chronic abdominal pain secondary to scaring from multiple surgeries; and neck pain with headache with muscle tightness and somatic dysfunction. (Id. at 253). Because Plaintiff's neck pain was mostly mechanical in nature, Dr. Martin planned a trial of osteopathic

treatment. (Id. at 252). For Plaintiff's back pain, Dr. Martin likewise treated Plaintiff with osteopathic manipulative treatment, resulting in fair release in the lumbar spine and fairly good release in the cervical spine. (Id.). For Plaintiff's abdominal scaring, Dr. Martin recommended massaging castor oil or peanut oil on the scars, and he discussed the possibility of scar injections with Plaintiff. (Id.). For medications, Dr. Martin prescribed a Lidoderm patch, refilled Plaintiff's Soma, and gave him samples of Ultracet. (Id.).

Following Dr. Butterfield's referral, Plaintiff visited Dr. Appert in Mayo's Dermatology department on September 24, 2003. (Id. at 531). To avoid allergens, Plaintiff was wearing cotton gloves almost continually throughout the day but sometimes removed the gloves for sleeping. (Id. at 531). Having identified certain allergens with Dr. Ouellette, Plaintiff had taken steps to avoid things he knew he was allergic to. (Id.). Nevertheless, Plaintiff still wore cologne occasionally causing a rash, and worked fixing computers about once per week, causing dermatitis flare-ups. (Id.). After explaining Plaintiff should avoid "all" contact with objects that aggravate the dermatitis, Dr. Appert prescribed betamethasone propionate (a topical corticosteroid). (Id.).

After reviewing Plaintiff's medical records from the University of Wisconsin, Dr. Appert noted that Plaintiff's previous allergy test was only read at 48 hours and not 96 hours, therefore, "it is difficult to say with certainty that all of these reactions would have persisted out until 96 hours." (Id.). Therefore, Dr. Appert contacted Plaintiff and planned to schedule him for an evaluation within the next month. (Id.).

On October 9, 2003, Plaintiff called Dr. Martin's office reporting that the Ultracet was not helping and his neck pain was worse. (Id. at 251). Dr. Martin put Plaintiff back on the Viocodin he was previously using and increased the dose of Ultracet. (Id.).

At Plaintiff's next appointment with Dr. Martin, on October 21, 2003, Plaintiff reported that the manipulation treatments he received at the last visit aggravated his neck but temporarily helped his back "a little bit." (Id.). On examination, Dr. Martin stated Plaintiff had a lot of discomfort in moving, he moved very slowly with subjective tenderness to palpitation in the spine and muscle tightness in the cervical spine. (Id.). The physical examination revealed a small traction sign on the left iliac crest, a "hint" of spondylolysis and a pelvic index of .58, which placed Plaintiff "in the low predicted back pain category." (Id.). Because Dr. Martin had not yet received Plaintiff's other medical records, he prescribed a Duragesic (narcotic) patch to give Plaintiff better pain control and planned to later look at what else could be done for Plaintiff's back and neck problems. (Id.). The next day, Plaintiff called Dr. Martin's office stating the Duragesic patch was not helping and Dr. Martin approved Plaintiff to use two patches per day. (Id. at 250). A week later, on October 28, 2003, Plaintiff again called Dr. Martin's office stating the 50 mg Duragesic patches were not helping and Dr. Martin approved increasing the doses to 75 mg. (Id.).

Having difficulties with the Duragesic patch, Plaintiff visited Dr. Martin again on October 30, 2003. (Id.). Not only did Plaintiff have problems getting the patches to stick, he also reported the patches did not give him much pain relief. (Id.). In addition to his chronic back and neck pain, Plaintiff stated he was also experiencing left arm and right knee pain. (Id.). Dr. Martin's examination of Plaintiff's knee showed extreme tenderness to palpitation but no laxity of the collateral ligaments. At that visit, Plaintiff's neck revealed right-sided muscle tightness and x-rays showed a pelvic obliquity. (Id.). Based on these findings, Dr. Martin diagnosed: chronic low back pain with elements of pelvic obliquity and ligamentous dysfunction, as well as, degenerative lumbar disc disease by history; neck and left arm pain of unknown etiology; and

increasing right knee pain. (Id.). Consequently, Dr. Martin increased Plaintiff's Duragesic prescription to 100 mg every three days and prescribed a Tegaderm patch (a mesh dressing to keep the patch in place), and Vicodin for breakthrough pain. (Id.). Additionally, Dr. Martin scheduled an MRI. (Id.).

Dr. George Mulopulos completed MRIs of Plaintiff's neck, back, and knee on October 31, 2003. (Id. at 254, 256). The radiology reports showed degenerative disc changes at the C6-7 level and a posterior protruding disc at the C6-7 and C5-6 levels. (Id. at 254). The MRIs of Plaintiff's knee showed normal ligaments, menisci, and muscles and no soft tissue abnormality. (Id. at 256). However, Dr. Mulopulos did find evidence of a small knee joint effusion and a very mild hyaline cartilage degenerative change in the patellofemoral joint. (Id.).

Stating that his lower back was "killing him more than anything," Plaintiff visited Dr. Martin on November 6, 2003. (Id. at 249). Having obtained Plaintiff's previous MRI results and medical records, Dr. Martin discussed treatment options with Plaintiff for his back and neck pain and recommended a selective nerve root block for Plaintiff's neck. (Id.). While Dr. Martin discussed with Plaintiff the possibility of physical therapy, Plaintiff believed it would be difficult for him to attend therapy multiple times per week because he lived far away. (Id.). For Plaintiff's knee, Dr. Martin recommended trigger point injections and Plaintiff elected to receive those at the visit. (Id.). Dr. Martin also suggested the possibility of a cortisone injection, although he cautioned Plaintiff the relief from such injections was usually short-lived. (Id.). In terms of medications, Dr. Martin continued the prescriptions for Vicodin, increased the Duragesic patch to 125 mg, and added prescriptions for Celebrex (NSAID) and a trial of castor oil packs for his abdominal scars. (Id.).

Less than a week later, on November 11, 2003, Plaintiff called Dr. Martin asking for an increased dose for his Duragesic patch. (Id.). Because Plaintiff's medication was increased the week before, Dr. Martin denied the request and told Plaintiff to wait and see how the 125 mg dose was working. (Id.).

Plaintiff received the selective nerve root block for his neck from Dr. Paul Olson on November 21, 2003. (Id. at 248 and 290-91). Later that day Plaintiff visited Dr. Martin and stated the nerve block "really did seem to make a difference." (Id. at 248). However, Plaintiff stated that he was still having a lot of low back pain and the 125 mg Duragesic patch did not seem to be enough. (Id.). In response Dr. Martin increased the patch dose to 150 mg, prescribed Vicodin ES, and gave Plaintiff a prescription to obtain a home muscle stimulator unit. (Id.).

As of December 3, 2003, Plaintiff had taken all of his Vicodin and called Dr. Martin's office asking for more. (Id.). Because it had not been two weeks since Dr. Martin wrote the last prescription, he authorized a refill but only with a fill date of December 5, 2003. (Id.).

Plaintiff did not show up for his December 11, 2003 appointment with Dr. Martin, but called the office the next day. (Id. at 247). In the call, Plaintiff reported that the nerve root block he had received from Dr. Olson for his neck helped for approximately four days. (Id.). Therefore, Dr. Martin faxed an order to have Dr. Olson repeat the injections. (Id.).

Complaining of neck spasms, Plaintiff went to the emergency room on December 14, 2003, and was treated by Dr. Kelly. (Id. at 235). Plaintiff told Dr. Kelly he was taking Lortab (a narcotic and acetaminophen) but reported the medication was "not helping." (Id.). The physical examination revealed muscle spasms and decreased range of motion in the neck. (Id. at 236-37). At the hospital, Dr. Kelly treated Plaintiff with injections of Toradol (NSAID), Vistaril

(antihistamine), Morphine, and Ativan (benzodiazepine). (Id. and 237, 266). At discharge Dr. Kelly prescribed Percocet. (Id.).

Once again Plaintiff received neck facet injections and a nerve block from Dr. Olson on December 16, 2003. (Id. at 286-87). After the facet injections, Plaintiff reported that a great percentage of his pain was resolved and his pain was almost completely resolved after the nerve block. (Id.).

Plaintiff returned to Dr. Martin's care on December 18, 2003. (Id. at 246). Based on conversations with Dr. Olson, Dr. Martin recommended another set of facet blocks at a different level. (Id.). After discussing Plaintiff's medications, Dr. Martin suggested having Plaintiff evaluated for an intrathecal pump because of his troubles controlling pain with medication. (Id.). Although it caused a burning sensation, Plaintiff stated the 150 mg Duragesic patch seemed to help. (Id.). In terms of prescriptions, Dr. Martin continued the Duragesic patch at 150 mg, and added prescriptions for Baclofen (a muscle relaxant), Vicodin, and Bentyl, (to treat Plaintiff's stomach pain). (Id.).

For the Minnesota Department of Human Services (DHS), on December 18, 2003, Dr. Kelly completed a disability examination. (Id. at 169). In the assessment, Dr. Kelly opined that Plaintiff's conditions prevented him from working and would last indefinitely. (Id.).

Dr. Kelly performed another disability examination on Plaintiff on December 23, 2003. (Id. at 166-68). Because of Plaintiff's back pain, Dr. Kelly stated Plaintiff was unable to lift, bend, or twist. (Id. at 166). Dr. Kelly reported that Plaintiff had a history of abdominal wound infections after an appendectomy and gastric bypass surgery. (Id.). As a result of these surgeries, as well as a past gunshot and stab wound, Dr. Kelly reported Plaintiff had chronic pain. (Id.). With respect to Plaintiff's allergies and dermatitis, Dr. Kelly proffered, "[t]his is

very disabling because any time he comes in contact with any sort of chemicals in an occupational setting he gets a severe outbreak with cracking, fissuring and even bleeding." (Id. at 166-67). Dr. Kelly's physical examination revealed a mild limitation in neck range of motion, mild tenderness in the vertebra, no edema or deformities in the lower extremities, and the back exam revealed Plaintiff was "somewhat" tender over the lumbar spine with forward flexion to about 75 degrees. (Id. at 167). Based on this assessment, Dr. Kelly concluded "[Patient] has multiple medical problems and pain that prohibits [sic] him from being gainfully employed." (Id.). Specifically, Dr. Kelly opined that Plaintiff would only be able to work in an "extremely" sedentary position with no bending, twisting, reaching, climbing, pushing or pulling, no lifting more than ten pounds and no contact with any chemicals that would aggravate Plaintiff's hands. (Id.). Finally Dr. Kelly stated, "[b]ased on this examination it appears that Mr. Booker is completely disabled and this would be for an indefinite period of time." (Id.).

Feeling the Baclofen was not helpful, Plaintiff called Dr. Martin's office on December 30, 2003, asking for a different prescription. (Id. at 246). Dr. Martin gave Plaintiff a prescription of Avinza/Avenzia (generic morphine) and Soma (a muscle relaxant). (Id.).

At the next appointment, on January 6, 2004, Plaintiff reported the Avinza helped but did not last a long time. (Id. at 245). While Plaintiff had spoken to Dr. Kelly about a referral for an intrathecal pump, Plaintiff needed to wait because he was changing his insurance. (Id.). At that appointment Dr. Martin continued the Avinza at 30 mg, twice per day. (Id.). On January 14, 2004, Plaintiff called Dr. Martin reporting the Avinza was helping, but Plaintiff was experiencing more pain in the morning. (Id.). In response, Dr. Martin prescribed one 60 mg Avinza in the morning, and one 30 mg Avinza in the evening. (Id.).

Plaintiff's next follow-up appointment with Dr. Martin was on January 16, 2004. (Id. at 244). At that time, Plaintiff reported problems falling asleep because of his neck problems and stated the Trazadone was not working. (Id.). Dr. Martin observed decreased range of motion about the cervical and lumbar spine and maintained his diagnosis of chronic neck and back pain. (Id.). For medications, Dr. Martin continued Plaintiff on the same doses of Avinza but discontinued the Trazadone. (Id.). Additionally, Dr. Martin added Zonogram (an anti-convulsant), and Doxepin (to replace the Trazadone). (Id.). In response to a call from Plaintiff, Dr. Martin increased Plaintiff's Avinza to 60 mg on January 21, 2004. (Id. at 243). Because Doxepin was not covered by Plaintiff's insurance, on January 23, 2004, Dr. Martin changed the prescription to Restoril (a sedative). (Id. at 244).

For his back and neck pain, Plaintiff visited Dr. Kelly on February 3, 2004. (Id. at 202). While Plaintiff usually treated with Dr. Martin for his chronic pain, Dr. Kelly assisted Plaintiff that day because Dr. Martin was out on a medical leave. (Id.). Dr. Kelly noted that, although Plaintiff was taking Avinza, Plaintiff "feels that is really not adequately controlling his pain . . . he does not want to increase the dose but he would like to have some sort of back-up medicine that he could take in addition to cover for his breakthrough pain." (Id.). Plaintiff reported that his pain was in his lower back and radiating into his legs and Dr. Kelly's physical examination showed somewhat limited range of motion in Plaintiff's neck but no difficulties with forward flexion. (Id.). To treat the pain, Dr. Kelly prescribed Vicodin. (Id.).

Reporting his medications were not alleviating his back pain, Plaintiff consulted Dr. Kelly on February 13, 2004. (Id. at 201). Plaintiff, who later that day was receiving an injection for his neck pain, had been taking Morphine long-acting tablets and Vicodin in-between the Morphine. (Id.). Having aggravated his back moving furniture the previous weekend, Plaintiff

reported to Dr. Kelly that these medications were "just really . . . not helping." (Id.). Dr. Kelly examined Plaintiff and found that Plaintiff's neck was stiff and he had localized tenderness over the lower cervical spine and lumbar spine. (Id.). Likewise Dr. Kelly stated "forward flexion i[s] very limited to about 110 degrees." (Id.). Dr. Kelly prescribed Percocet and recommended Plaintiff follow-up with Dr. Martin for his pain. (Id.). That afternoon, Dr. Paul Olson gave Plaintiff Lidocaine injections into his neck and Plaintiff reported a complete relief of symptoms. (Id. at 232-33, 284-85).

Dr. Martin refilled Plaintiff's Soma prescription on February 17, 2004. (Id. at 243). Two days later on February 19, 2004, Plaintiff called asking for additional pain medications to last him until his next appointment on February 26, 2004. (Id.). Dr. Martin declined to give Plaintiff any additional prescriptions because Plaintiff was given a month's prescription of Avinza on January 29, 2004, and therefore Plaintiff should have had enough medications through February 27th. (Id.).

Plaintiff, complaining of depression, visited Dr. Kelly on February 26, 2004 and asked for a sleep aid. (Id. at 200). At the visit Dr. Kelly noted Plaintiff was interested in the La Crosse Gundersen Pain Management clinic. (Id.). Dr. Kelly continued Plaintiff's depression medication and added a sleep medication. (Id.).

Later that same day, Plaintiff treated with Dr. Martin for his neck and back pain. (Id. at 242). The physical examination revealed a lot of subjective tenderness to palpation on the cervical spine, especially on the right side. (Id.). Although Plaintiff reported weakness in his right hand, Dr. Martin did not observe any hand weakness. (Id.). Dr. Martin discontinued Plaintiff's Ultram, continued Plaintiff's prescription for Avinza, and gave him a prescription for Percocet. (Id.).

After slipping on some ice, Plaintiff returned to Dr. Martin on March 19, 2004. (Id.). At the visit Plaintiff reported "hurting all over," problems sleeping, headaches, and an aggravation of his symptoms from the weather. (Id.). Plaintiff had "run out" of his Percocet because he was having so many pain problems and therefore he took some of his wife's Ultracet. (Id.). After admonishing Plaintiff for using his wife's medications, Dr. Martin discussed with the Plaintiff the possibility of Plaintiff attending a pain clinic in LaCrosse, Wisconsin to be evaluated for the interthecal pump. (Id.). Because Dr. Kelly was Plaintiff's primary physician, Dr. Martin told Plaintiff to follow-up with Dr. Kelly for the pain clinic referral. (Id.). For medications, Dr. Martin increased Plaintiff's Avinza to 90 mg, and gave Plaintiff additional prescriptions for Percocet and Ultracet. (Id.).

On March 23, 2004, Plaintiff called Dr. Martin's office and reported his insurance would no longer cover the Avinza. (Id. at 241). In response Dr. Martin replaced the Avinza with MS Contin, another narcotic pain-reliever. (Id.).

Because he had been doubling up on the MS Contin, Plaintiff ran out of his pain medications on March 30, 2004. (Id.). According to Dr. Martin's notes, Plaintiff was required to try at least two other medications before his insurance would cover the Avinza. (Id.). Instead Dr. Martin prescribed Kadian (another narcotic pain reliever). (Id.). The next day, however, Plaintiff called and reported that his pharmacy was out of Kadian and could not fill the prescription for three or four days. (Id.). Dr. Martin replaced the Kadian prescription with Percocet. The next day, the pharmacy called Dr. Martin's office saying they could not fill the Percocet prescription because Plaintiff had used up his allotment of Percocet at three times per day. (Id.). Verbally, Dr. Martin authorized the pharmacy to prescribe the Percocet for use up to six times per day. (Id.).

Reporting continued problems with his medications, Plaintiff called Dr. Martin's office on April 6, 2004. (Id. at 240). Plaintiff stated that the Kadian "is really bad" and caused him tremors, nightmares, and a severely upset stomach. (Id.). Because of these side effects, Plaintiff asked to go back to taking Avinza and also asked for another prescription of Percocet. (Id.). Because Plaintiff was a week early, Dr. Martin denied the Percocet prescription but agreed to prescribe the Avinza, as well as Ultracet. (Id.). Plaintiff also asked for sleep medications and Dr. Martin prescribed Halcion (a sedative) and Trazadone. (Id.).

Because he was moving, Plaintiff called Dr. Martin on April 14, 2004, asking for additional medications. (Id.). With respect to the Avinza, Plaintiff stated it took the edge off but did not quite work. (Id.). Instead, Plaintiff asked to increase the doses of his pain medications and wanted another early fill on his Percocet and asked for a higher dose. (Id.). Dr. Martin denied these requests on the 14th, but gave Plaintiff a prescription for the Percocet on April 16, 2004. (Id.).

Reporting he was unusually sore from packing to move, Plaintiff returned to Dr. Martin on April 21, 2004. (Id.). At that time, Plaintiff had an appointment at the LaCrosse pain clinic for May 6 to be evaluated for the interthecal pump. (Id.). Once again Plaintiff asked for "a few extra pain medications." (Id.). Dr. Martin refused to give Plaintiff an increase on the Percocet, but agreed to increase the Avinza to 30 mg once per day to take in addition to his 90 mg tablets. (Id.).

Because Dr. Martin was gone for the week, Dr. Kelly treated Plaintiff on May 5, 2004. (Id. at 198). Noting Plaintiff was taking Avinza, Percocet, Soma, Ultracet and Lidoderm patches, Dr. Kelly reported Plaintiff wanted refills of his medications. (Id.). Dr. Kelly gave Plaintiff prescriptions for the Avinza, Percocet, Lidoderm patches, and his Trazadone. (Id.). Dr.

Kelly reported that Plaintiff asked for more Ultracet as well, but Dr. Kelly told him "that would be inappropriate . . . in light of the strong narcotics he is already taking." (Id.).

After Plaintiff was told he was not a candidate for an interthecal pump, Plaintiff called Dr. Martin's office on May 13, 2004 asking for a referral for a second opinion. (Id. at 239). Once again Plaintiff reported that the Percocet and Avinza were not helping and asked for a different medication. (Id.). In response, Dr. Martin gave Plaintiff a ten-day trial of Methadone. (Id.). Despite his report that the Percocet was not helping, later that day Plaintiff called Dr. Martin again, this time requesting some Percocet. (Id.). Because Plaintiff was starting the trial of Methadone, Dr. Martin denied the Percocet request. (Id.).

Four days later, Plaintiff called Dr. Martin stating he wanted a different medication because the Methadone was not working. (Id.). Until Plaintiff finished the ten-day Methadone trial, Dr. Martin declined to change Plaintiff's medications. (Id.).

Having injured his knee while carrying boxes, Plaintiff treated with Dr. Roosevelt Smith for knee pain, rash, and chronic back pain on May 28, 2004. (Id. at 196-97). The physical examination of Plaintiff's knee showed no swelling or effusion, normal knee alignment and mobility, and full range of motion, although Plaintiff walked as if in pain. (Id. at 196). After reviewing the X-rays, Dr Smith concluded Plaintiff had only mild degenerative changes and atherosclerosis (narrowing) of the vessels of the lower leg. (Id.). For treatment, Dr. Smith prescribed an ace bandage, ice, and Tylenol or Advil. (Id.).

The same day, Plaintiff called Dr. Martin and asked for a refill of Soma. (Id. at 238). Because Plaintiff had told another doctor in the office that the Soma did not help "at all," Dr. Martin declined this request. (Id.). Later Plaintiff called asking why his Methadone prescription was decreased instead of increased and asked for a refill of Ultracet. (Id.). Because Plaintiff had

only used Ultracet on a couple of occasions, Dr. Martin's office called Plaintiff's pharmacy. (Id.). From the pharmacy, Dr. Martin learned that Plaintiff had filled a prescription that day for 30 Hydrocodone while at the same time requesting a refill of his other medicine. (Id.). Because this was a violation of Plaintiff's narcotic contract, Dr. Martin indicated he would no longer be refilling any medicines for Plaintiff, other than a taper of the Methadone. (Id.).

For his knee pain, Plaintiff followed-up with Dr. Kelly on June 2, 2004. (Id. at 197). Dr. Kelly's examination found that Plaintiff was "exquisitely tender"[3] over the medial joint space and experienced "exquisite pain" upon stress of the medial cartilage, although there was no edema or effusion. (Id.). The MRI of Plaintiff's knee showed minimal degenerative changes and knee joint effusion, but was otherwise unremarkable. (Id. at 193, 282). Believing Dr. Martin was unavailable, Dr. Kelly gave Plaintiff prescriptions for Soma, Avinza, Percocet, and Triazolam (a sedative) and stated "this should last him at least two months." (Id. at 197).

Dr. Martin, having received a letter regarding Plaintiff, called Dr. Kelly's office on June 8, 2004. (Id. at 194). Concerned about Plaintiff's medications, Dr. Martin informed Dr. Kelly Plaintiff's Soma, Percocet, and Avinza had all been discontinued and Plaintiff was "abusing the Percocet." (Id.). At the end of the phone message Dr Martin stated "[i]n other words – he has a lot of medication in his possession." (Id.).

On June 11, 2004, Dr. Martin sent a discharge letter to Plaintiff, his pharmacy, and Dr. Kelly. (Id.). After receiving the letter, Plaintiff called Dr. Martin's office on June 18, 2004. (Id.). To explain the medication issues, Plaintiff reported that he had received the Hydrocodone prescription for his knee injury. (Id.). Additionally, Plaintiff reported that the last Methadone prescription that was given to him was written wrong and he never filled it and instead he filled

---

[3] As a medical term, exquisite means extremely intense. Stedman's Medical Dictionary, Exquisite (27th Ed. 2000).

the Soma, Avinza, and Percocet. (Id.). Even with this additional information, Dr. Martin declined to reinstate Plaintiff as a patient. (Id.).

Plaintiff, complaining of fever, weakness, and nausea, visited Dr. Kelly on June 29, 2004. (Id. at 192). Dr. Kelly's examination revealed no abnormalities, other than some nasal congestion. (Id.). Dr. Kelly, while stating the etiology of Plaintiff's symptoms was unclear, believed Plaintiff might be having narcotic withdrawal. (Id.). Although Dr. Kelly prescribed Plaintiff a two-month supply of pain medication on June 2, (Id. at 197), Plaintiff had run out of his medications at this time. (Id. at 192). Nonetheless, Dr. Kelly renewed Plaintiff's prescriptions for Avinza, Soma, and Percocet. (Id.). Dr. Kelly stated in his patient notes, however, "I told him I did not feel comfortable prescribing these long term for him [and] that if he wants to continue this sort of thing he needs to be under the care of a pain management physician. He doesn't care to see Dr. Martin again. He is interested [in] getting referred for pain management." (Id.).

Having run out of his pain medications again, Plaintiff was admitted to Community Memorial Hospital on July 23, 2004 complaining of back pain, abdominal pain and a fever. (Id. at 218, 219). The hospital notes indicate "[h]e has been doing a lot of heavy lifting recently, which he is not supposed to be doing . . . feels that he might have injured his back doing this. Because of his increased pain he has taken more pain meds than was prescribed and therefore is now out of his pain meds." (Id.). Diagnosed with narcotic withdrawal and dehydration, Plaintiff was admitted to the hospital and treated with fluids and Morphine. (Id. at 219, 261). To rule out COPD, Dr. Kelly ordered chest X-rays and the results were normal. (Id. at 280). At discharge, Plaintiff was prescribed Avinza, Zofran (anti-nauseate), and Levaquin (an antibiotic). (Id. at 221).

Reporting his abdominal pain continued, Plaintiff called Dr. Kelly's office on July 29, 2004, asking for more medication. (Id. at 189). Believing Plaintiff might be suffering from diverticulitis,[4] Dr. Kelly prescribed an antibiotic and made an appointment for a CT scan. (Id.). With regard to his pain medications, Plaintiff asked for Soma, a sleep aid, and a prescription for Percocet instead of the Avinza and Dr. Kelly complied. (Id.).

Once again Dr. Kelly examined Plaintiff on August 5, 2004, because of continued abdominal pain. (Id. at 187). At the visit Dr. Kelly noted that Plaintiff had already taken all of the narcotic pain medication given to Plaintiff when he was discharged from the hospital. (Id.). Additionally, Plaintiff told Dr. Kelly he had already taken all of the Percocet and Soma Dr. Kelly prescribed the week before. (Id.). Although he refilled Plaintiff's prescriptions, Dr. Kelly cautioned that Plaintiff needed to taper off the use of narcotics and see a pain management doctor. (Id.). Dr. Kelly also ordered CT scans of Plaintiff's abdomen, which were normal other than a mild biliary tract dilation. (Id. at 185-86, 187).

From August 31 to September 15, 2004, Plaintiff was hospitalized at Saint Mary's Hospital. (Id. at 485-86, 489 -510, 525-26). Plaintiff arrived at the emergency department with altered mental status, diarrhea, shortness of breath, and a severe metabolic acidosis. (Id. at 489). Noting Plaintiff's chronic pain syndrome, Dr. Karen Swanson reported that Plaintiff had run out of his narcotics a week earlier and then developed severe diarrhea. (Id.). Over the course of Plaintiff's hospitalization, he was diagnosed with renal failure, extensive bilateral pulmonary infiltrates, severe metabolic acidosis[5] from renal failure and diarrhea, hypokalemia (potassium

---

[4] An inflammation of the small pockets of the colon causing inflammation and obstruction of the colon. Stedman's Medical Dictionary, Diverticulitis (27th Ed. 2000).

[5] Decreased pH and bicarbonate concentration in the body fluids. Stedman's Medical Dictionary, Acidosis (27th Ed. 2000).

deficiency), and leukocytosis.[6]  (Id. at 489-510).  At the hospital Plaintiff developed hospital-acquired pneumonia caused by staph bacteria, Methicillin-Resistant Staphylococcus Aureus (MRSA).  (Id. 489-510, 507).  During the hospitalization, Plaintiff developed skin lesions on his face and buttocks.  (Id. at 507).  The Dermatology department took a skin biopsy from Plaintiff on September 9, 2004 and the results were consistent with chronic dermatitis.  (Id. at 568).  At discharge Plaintiff was given plans to establish care and treatment for his chronic pain, chronic diarrhea, and a follow-up with urology for prostatitis.[7]  (Id. at 509-10).

Because of his back pain, Plaintiff went to the emergency room again on September 19, 2004.  (Id. at 523-24).  Plaintiff stated that he was having difficulty taking care of himself because his back pain was not controlled and stated he never received his Oxycontin prescription from the hospital.  (Id. at 523).  In response, Dr. Daniel Hankins gave Plaintiff a prescription for Oxycontin, enough to "get him through to his clinic appointment later this week."  (Id. at 524).

After Plaintiff's hospitalization, he had a follow-up visit at the Mayo Clinic on September 22, 2004.  (Id. at 481-82).  At the examination Plaintiff reported muscle pain, fatigue, night sweats and chills, weakness, and dyspnea (shortness of breath).  (Id. at 481).  At that time Plaintiff's prescriptions included:  Fluconazole, Ciprofloxacin, Amoxicillin, Tylenol, Oxycodone, Trazadone, and Oxycontin.  (Id. at 481-82).  Dr. Amina Khan evaluated Plaintiff and noted Plaintiff's heart rate and rhythm were normal, his lungs were clear, his abdomen was soft and non-tender (other than Plaintiff's scars), no edema in the extremities, and normal lymph nodes.  (Id. at 482).  For Plaintiff's chronic pain, Dr. Kahn refilled Plaintiff's Oxycontin and Oxycodone prescriptions and planned to see Plaintiff in another week.  (Id. at 483).

---

[6]   An abnormally large number of leukocytes or white blood cells, usually indicating an acute infection.  Stedman's Medical Dictionary, Leukocytosis (27th Ed. 2000).
[7]   Inflammation of the prostate.  Stedman's Medical Dictionary, Prostatitis (27th Ed. 2000).

At the Mayo Clinic, Plaintiff had an echocardiogram on September 24, 2004. (Id. at 568-69). The test showed: a normal sinus rhythm; aortic valve sclerosis (thickening) without stenosis or regurgitation; normal mitral, pulmonary and tricuspid valves; no vegetations; mild left atrial enlargement; normal left atrial appendage; no intracardiac mass or thrombus; normal left ventricular chamber size with ejection fraction 60%; no shunt at atrial level; mild immobile atherosclerosis of the descending thoracic aorta, no pericardial effusion, and normal pulmonary veins and aortic arch. (Id. at 537, 568-69).

Complaining of fever, chills, joint pain, shortness of breath, a non-productive cough, and a sore throat, Plaintiff was hospitalized again from September 26 to October 4, 2004. (Id. at 513-16, 521-22). After performing tests to rule out meningitis, Dr. Ann Vincent diagnosed chronic pain syndrome and gave plaintiff a prescription for Fentanyl patches (another narcotic). (Id. at 513, 515). At discharge Plaintiff could move independently and walk 50 feet without difficulty. (Id. at 516). For treatment, Dr. Vincent recommended that Plaintiff do regular exercise and a back exercise program. (Id. at 516).

Because of his continuing back and neck pain, Plaintiff treated with Dr. Justin Mott on October 12, 2004, reporting his MS Contin did not control his pain. (Id. at 476-78). Additionally, Plaintiff reported that he experienced neck pain that Dr. Mott stated "was not well characterized in this interview," diarrhea and "some" abdominal pain. (Id. at 476-77). The physical examination of Plaintiff's back showed that Plaintiff was diffusely tender to light touch with hyperalgesia (increased sensitivity to pain) in his upper back and neck area. (Id. at 477). Nonetheless, Plaintiff's gait was normal and he was able to get on and off the examining table without assistance. (Id.). Dr. Mott, concerned about Plaintiff's medications, stated Plaintiff "exhibited some behaviors of drug-seeking behavior, specifically naming medicines and naming

doses which he felt would be appropriate for his care." (Id. at 477-78). After speaking with Dr. Chan, who assisted in Plaintiff's last hospitalization, Dr. Mott determined that the best treatment for Plaintiff would be to taper his narcotic medicine. (Id. at 478). Both Dr. Mott and Dr. Chan agreed that Plaintiff had "pain-focused behaviors," and recommended Plaintiff visit a pain clinic (Id.). For medication Dr. Mott only gave Plaintiff enough MS Contin to last Plaintiff until Plaintiff's next appointment with Dr. Chan on October 28. (Id.). At the end of the appointment, Dr. Mott requested that Plaintiff sign release forms so he could obtain Plaintiff's records from Dr. Kelly and Dr. Martin. (Id.). Although Plaintiff did fill out the forms, he stated that the "physicians who treated him there were liars." (Id.).

Because Plaintiff continued to experience progressively worsening fever, chills, abdominal pain, night sweats, scrotal pain, and nausea, Plaintiff went to the Mayo Clinic emergency room on October 21, 2004 and was hospitalized. (Id. at 470, 472). Dr. Surbhi Leekha and Dr. J. T. Mangan, Plaintiff's hospital physicians, diagnosed febrile (fever) illness, chronic pain syndrome, intermittent-chronic diarrhea, and nausea. (Id. at 517-18). Dr. Mangan also noted Plaintiff's narcotic dependence might be Plaintiff's "primary underlying problem" and recommended tapering Plaintiff off narcotics. (Id. at 378).

Following-up on Plaintiff's recent hospitalizations, Dr. Chan treated Plaintiff on October 28, 2004. (Id. at 466-68). Because CT scans, a colonoscopy, and other testing did not reveal any abnormalities, Dr. Chan stated Plaintiff's chronic diarrhea was dumping syndrome[8] secondary to his previous gastric bypass syndrome and prescribed Lomotil. (Id. at 466, 467). For Plaintiff's

---

[8]    Syndrome, often occurring after gastric-bypass surgery, characterized by flushing, sweating, dizziness, weakness, and vasomotor collapse after eating, resulting from rapid passage of large amounts of food into the small intestine, with an osmotic effect removing fluid from plasma and causing decreased blood volume. Stedman's Medical Dictionary, Syndrome, Dumping Syndrome (27th Ed. 2000).

chronic pain, Dr. Chan recommended Plaintiff go to the Mayo Pain Clinic and seek physical therapy. (Id. at 467).

On October 28, 2004, an electromyography examination and nerve conduction study was done on Plaintiff's right lower leg with normal results and no evidence of lumbosacral radiculopathy. (Id. at 567).

After jamming his finger in a fall, Plaintiff went to the Mayo Clinic on November 26, 2004. (Id. at 570). After diagnosing brachyphalangia[9] in the left small finger, Dr. J.P. Strickland placed Plaintiff's lower arm and hand in a splint. (Id.).

Following the referrals of Dr. Mott and Dr. Chan, Plaintiff visited the Mayo Pain Clinic on November 8, 2004. (Id. at 459-63). Dr. Marc Huntoon and registered nurse Anita Haugland treated Plaintiff for his neck, low back, and bilateral leg pain. (Id.). At that visit Plaintiff rated his pain as eight and a half out of ten and related that his pain was aggravated by moving, bending, lifting, twisting, prolonged sitting, prolonged standing, and temperature or weather changes. (Id. at 461). In terms of daily activities, Plaintiff reported his pain had impacted his abilities in dressing, personal hygiene, physical activities, housework, employment, driving, socializing and relationships, and his hobbies and leisure activities. (Id. at 461). After considering Plaintiff's medication history, Dr. Huntoon stated "[t]he patient has tried nearly every muscle relaxant, benzodiazepines, anti-epileptic drugs, anti-depressant drugs, nearly every opiate possible, and nearly every NSAID possible without any significant improvement." (Id. at 459). Dr. Huntoon then reviewed Plaintiff's x-rays and MRIs and concluded that Plaintiff had some degenerative changes in his lower back and neck, some mild foraminal encroachment in his neck and some facet hypertrophy (enlargement of the facet joint). (Id. at 459). During his

---

[9]   An abnormal shortness of the finger bone. Stedman's Medical Dictionary, Brachyphalangia (27th Ed. 2000).

physical examination, Dr. Huntoon noted Plaintiff exhibited positive Waddell's scores for "simulated" tenderness.  (Id.).  Overall, Dr. Huntoon's impression was:

> This patient has significant long-term pain.  He is already on opiates and is a very poor candidate for [sic] implanted pump.  At this juncture, I think it would not be unreasonable to continue him on his current opiate perhaps even one or two immediate release tablets could be prescribed for in-between times.  I think it will be difficult to get him completely off his opiates and he probably would not do well in the Pain Rehabilitation Program as I don't think he would ever engage fully in the therapies they would offer.  Although, if one could talk him into being evaluated for this, I would appreciate the opinion from [doctors in the Physical Medicine and Rehabilitation Clinic] about his suitability for pain rehabilitation.  I certainly have nothing to offer him from the standpoint of an implanted device or any procedural modalities for his current condition.

(Id. at 459).

Complaining of a reoccurrence of his low back pain because of a fall, on December 26, 2004, Plaintiff returned to the Mayo Clinic emergency room.  (Id. at 360-61).  The emergency room physician, Dr. Nicola Schiebel, diagnosed musculoskeletal back pain and treated Plaintiff with IV morphine.  (Id. at 360).  At discharge she gave Plaintiff a prescription for Vicodin.  (Id.).

After another fall, Plaintiff returned to the Emergency Room for his back pain, this time at Community Memorial Hospital on December 31, 2004.  (Id. at 258).  In describing his symptoms, Plaintiff reported sharp pain in his back radiating into his legs that was aggravated by movement, as well as, a headache, fever, frequent urination, trouble breathing, chest pain, abdominal pain, nausea, vomiting, and bloody stools.  (Id. at 259).  On examination Plaintiff' stomach was nontender, plaintiff had painless range of motion in his neck, his heart rate and rhythm were normal and he was not in respiratory distress.  (Id. at 260).  With regard to Plaintiff's back, it was tender on palpitation but straight leg testing was negative.  (Id.).  Dr. Morales prescribed Toradol and Phenergan and discharged Plaintiff.  (Id. at 258).

Because of his finger injury, on January 28, 2005, Plaintiff visited Dr. David Dennison in Mayo's hand clinic. (Id. at 644). In reviewing Plaintiff's medical history, Dr. Dennison noted Plaintiff's chronic back pain and "narcotic dependency." (Id.). Plaintiff's finger was swollen and he was experiencing joint pain and tenderness. (Id.). After viewing x-rays of Plaintiff's hand, Dr. Dennison diagnosed mallet finger[10] and prescribed a finger splint. (Id. at 643-45).

Reporting a cough and exacerbated back pain, Plaintiff treated with nurse practitioner Susan Buck on February 11, 2005. (Id. at 741). The physical examination showed Plaintiff's back was exquisitely tender and Plaintiff had trouble heel to toe walking. (Id.). Ms. Buck diagnosed bronchitis and back pain and prescribed an antibiotic, Flexeril, and Ultram. (Id.).

In order to establish a primary care relationship, Plaintiff visited Dr. Robert Taylor at Mayo's Plainview clinic on February 16, 2005. (Id. at 664). Plaintiff told Dr. Taylor he experienced restless legs syndrome and chronic back and neck pain. (Id.). On examination, Plaintiff's heart and lungs were normal and Plaintiff had normal range of motion in his extremities. (Id.). While Plaintiff had diffuse tenderness, he did not meet the criteria for fibromyalgia. (Id.). In terms of his back range of motion, straight leg testing was negative and Plaintiff was able to bend forward at the waist to 45 degrees. (Id.). After Plaintiff reported to Dr. Taylor that Soma had helped him in the past with his pain, Dr. Taylor prescribed Plaintiff Soma and planned to follow-up with Plaintiff in one month. (Id.).

At the next visit on March 17, 2005, Plaintiff's chief complaint was insomnia because of life stressors, including trying to get disability benefits. (Id. at 663). For the insomnia Dr. Taylor prescribed a trial of Sonata. (Id.). For his back pain, Plaintiff asked Dr. Taylor if he could increase his Soma from three to four times per day and Dr. Taylor agreed. (Id.).

---

[10]   Finger injury causing damage to the extensor tendon in the finger, usually resulting from a hyperextension or "jamming" of the finger. Stedman's Medical Dictionary, Finger, Mallet Finger (27th Ed. 2000).

On April 7, 2005, Plaintiff asked Dr. Taylor to complete a disability form for his social security application. (Id. at 662). Dr. Taylor reviewed Plaintiff's medical records, including records from Dr. Martin and Dr. Kelly, and he performed a physical examination. (Id.). With respect to Plaintiff's limitations, Dr. Taylor stated that Plaintiff would be able to eat, bathe and perform personal care functions without difficulty, but he would be unable to walk, stand, or lift for "long periods of time," and that Plaintiff would need to limit contact with the materials that caused his dermatitis. (Id.). For Plaintiff's back pain, Dr. Taylor refilled Plaintiff's Soma and added Ultracet. (Id.). After noting Plaintiff's extensive narcotic use, Dr. Taylor stated Plaintiff should visit a pain clinic and told Plaintiff he would not prescribe any more narcotics. (Id.).

The next day Plaintiff returned to Dr. Dennison for new finger pain. (Id. at 643). Plaintiff, reporting pain in his small left finger, stated the pain woke him at night, and he experienced numbness and pain on flexion. (Id. at 643). On physical examination Dr. Dennison found Plaintiff's upper finger joint was quite tender and had crepitus (popping) with motion. (Id.). X-rays of Plaintiff's hand showed a shortening of the fingers and upper joint arthritis of the small finger. (Id.). Because Plaintiff's previous use of a splint was ineffective, Dr. Dennison gave Plaintiff an injection of Kenalog (corticosteroid). (Id.).

The next month, on May 4, 2005, Plaintiff again visited Dr. Dennison. (Id. at 642). Plaintiff continued to experience significant pain in his finger with some mild swelling. (Id.). After explaining the risks and benefits of the procedure, Dr. Dennison recommended Plaintiff have a joint fusion in his small finger and Plaintiff agreed. (Id.).

For a pre-operative examination, Dr. Taylor examined Plaintiff on May 12, 2005. (Id. at 660-61). After reporting that his neck and back pain were worsening, Plaintiff asked Dr. Taylor to increase his Soma dosage and Dr. Taylor agreed. (Id. at 660). An EKG showed a normal

heart rhythm but a chest x-ray showed poor inspiratory (breath intake) effort. (Id.). Dr. Taylor agreed that Plaintiff's cardiovascular risk factors, a history of lung cancer and coronary artery disease, required additional testing before the surgery. (Id.).

In anticipation of his surgery, on May 17 and 18, 2005, Plaintiff completed pulmonary and cardiovascular testing by Dr. Matthew Martinez with normal results. (Id. at 637-41, 686).

After living in a tent for a number of weeks, Plaintiff reported to Dr. Taylor that he had an increase in his back and neck pain and a productive cough on July 7, 2005. (Id. at 659). For his back and neck pain, Plaintiff requested prescriptions for Soma, Albuterol, Amitriptyline and Tramadol. (Id. at 659). Because of his living conditions and car problems, Plaintiff stated he was unable to have his finger surgery and was unable to follow-up with Dr. Taylor's referrals to allergy, urology and a pain clinic. (Id. at 659). On examination, Dr. Taylor concluded that Plaintiff's back and neck pain remain unchanged. (Id.). Dr. Taylor diagnosed bronchitis and gave Plaintiff prescriptions for Soma, Advair, Tramadol, Amitriptyline, and an antibiotic. (Id.).

Complaining of right-hand pain, Plaintiff treated with Dr. Marvin Timm on August 10, 2005. (Id. at 658). A week earlier, Plaintiff became dizzy, passed out, and then fell on his hand. (Id.). Dr. Timm diagnosed a contusion and tendonitis and prescribed Celebrex and Trazadone. (Id.). Later that month, on August 22, 2005, Plaintiff was examined by Dr. Gregory Anghlman for continued hand pain and was prescribed Toradol and Rocephin (antibiotic). (Id. at 657).

On September 19, 2005, Plaintiff visited Dr. Jeremy Solberg for evaluation of right hand pain and a follow-up of Plaintiff's other conditions. (Id. at 656). Plaintiff experienced exquisite tenderness to palpitation of his hand and Dr. Solberg noted Plaintiff "is a bit hysterical about his pain in his hand." (Id.). Dr. Solberg diagnosed chronic pain syndrome and right hand pain, potentially related to rheumatoid arthritis. (Id.). For treatment, Dr. Solberg gave Plaintiff a

three-week prescription of Percocet, but explained he would not give Plaintiff any additional narcotic pain medication until Plaintiff went to a pain clinic. (<u>Id.</u>).

Because his hand pain continued, on September 28, 2005, Plaintiff returned to Dr. Solberg. (<u>Id.</u> at 655). At that visit, Plaintiff reported pain and decreased strength and flexibility in his hand and requested more pain medication. (<u>Id.</u>). The tests to determine if Plaintiff had rheumatoid arthritis were negative and Dr. Solberg continued Plaintiff on Soma and Tramadol. (<u>Id.</u>). Additionally, Dr. Solberg asked Plaintiff to see a pain specialist and referred him to Dr. Jeffrey Brault at the Physical Medicine & Rehabilitation Department. (<u>Id.</u>). Before he would prescribe any more narcotics, muscle relaxants or other pain medications, Dr. Solberg told Plaintiff he would need to sign a narcotic contract. (<u>Id.</u>).

Plaintiff returned to Dr. Solberg on October 14, 2005. (<u>Id.</u> at 653-54). In addition to his continued hand pain, Plaintiff reported chest tightness, wheezing and a cough. (<u>Id.</u> at 653). Dr. Solberg diagnosed an upper respiratory infection and prescribed an antibiotic. (<u>Id.</u> at 654). Plaintiff also requested a re-fill of his pain medications, including the Percocet, which Dr. Solberg gave him. (<u>Id.</u> at 653-54).

On November 2, 2005, Plaintiff visited Dr. Mary Daly at the Plainview clinic for a cough and chest tightness. (<u>Id.</u> at 652). The follow-up CT scan of Plaintiff's lungs, ordered by Dr. Solberg, was normal. (<u>Id.</u>). Dr. Daly counseled Plaintiff to quit smoking and to continue with his inhaler and nebulizer. (<u>Id.</u>).

Based on the referral from Dr. Solberg, Plaintiff visited Dr. Brault on November 9, 2005. (<u>Id.</u> at 633-35). Plaintiff complained that, over the past few months, his fingers had begun to lock and he experienced generalized pain. (<u>Id.</u> at 633). On examination, Plaintiff had limited range of motion in his back and neck, and tenderness in his right fingers. (<u>Id.</u> at 634). Dr. Brault

noted that Plaintiff had a Waddell's score of three out of five, suggesting a non-anatomical or organic source of pain, i.e. psychological overreaction and fixation on pain. (<u>Id.</u>). After remarking that he was "quite concerned" about Plaintiff's extensive narcotic medications, Dr. Brault recommended Plaintiff seek treatment from a pain clinic or rehabilitation program. (<u>Id.</u> at 634). Additionally, Dr. Brault recommended testing to determine if Plaintiff's joint pain was from arthritic changes or early degenerative disc disease. (<u>Id.</u>). At the end of the appointment Dr. Brault gave Plaintiff a steroid joint injection in his right middle finger. (<u>Id.</u> at 636).

For ongoing management of his chronic pain, Plaintiff returned to Dr. Solberg on November 21, 2005. (<u>Id.</u> at 651). Because of changes in the weather, Plaintiff reported an increase in pain in his back, hands, and lower extremities. (<u>Id.</u>). Dr Solberg discussed with Plaintiff his narcotic use and stated "I am uncomfortable continuing at the present dose of Percocet for very long [treatment] of his pain . . . I feel that a slow reduction in his Percocet, Soma, and Tramadol is appropriate." (<u>Id.</u>). Plaintiff was concerned about tapering off his pain medications because he did not want to go through a lot of pain. (<u>Id.</u>).

After Dr. Solberg's referral, Dr. Russell Gelfman in the Physical Medicine and Rehabilitation department performed a disability examination for Plaintiff on December 6, 2005. (<u>Id.</u> at 697-701). Dr. Gelfman first went through Plaintiff's medical records, but noted he did not have complete records, then reviewed Plaintiff's extensive complaints and medications. (<u>Id.</u> at 697-700). During the physical examination, Dr. Gelfman noted that Plaintiff's limitations could not be fully assessed because of his pain behaviors. (<u>Id.</u> at 700). With respect to Plaintiff's work capacity, Dr. Gelfman agreed Plaintiff was "possibly" disabled from working in a casino because of his contact dermatitis with metals. (<u>Id.</u> at 701). Dr. Gelfman then stated "[p]erhaps more pronounced; however, is an apparent underlying depression which has been previously identified

in the Pain Clinic . . . It is not in my area of expertise to render a definitive opinion regarding his disability in relation to that particular diagnosis." (Id.). With regard to Plaintiff's back and neck pain, Dr. Gelfman concluded "typically this amount of degenerative changes are [sic] not entirely disabling although it may make him less suitable for any heavy work activities." (Id.).

Reporting that the Percocet was not working, Plaintiff called Dr. Solberg on December 29, 2005, requesting a stronger pain medication. (Id. at 738). Dr. Solberg declined the request and stated Plaintiff would have to discuss his medications with the pain clinic. (Id.).

Dr. Clement Michet, in Mayo's Rheumatology department, treated Plaintiff on January 17, 2006. (Id. at 694-95). After examining Plaintiff, Dr. Michet stated that Plaintiff had normal range of motion in his back and neck and no muscle weakness. (Id. at 695). Ultimately Dr. Michet concluded there was no rheumatic disease to account for Plaintiff's chronic pain. (Id.).

Once again, on January 18, 2006, Plaintiff called Dr. Solberg's office asking for additional Percocet. (Id. at 735). While Dr. Solberg agreed to give Plaintiff the refill, he stated he would not give Plaintiff any more refills until Plaintiff was seen at the pain clinic. (Id.).

A week later, on January 26, 2006, Plaintiff had a follow-up visit with Dr. Solberg. (Id. at 733). At that visit Dr. Solberg had Plaintiff sign a controlled substances agreement providing that Dr. Solberg would be the only doctor to provide Plaintiff with pain medications. (Id.). Dr. Solberg told Plaintiff he would only provide the pain medications until Plaintiff was able to return to the pain clinic. (Id.).

At a February 28, 2006 visit for an infection, Plaintiff asked Dr. Solberg about the disability report from Dr. Gelfman. (Id. at 731). Based on Plaintiff's symptoms and history, Dr. Solberg stated he agreed with Dr. Gelfman that Plaintiff's conditions would not prevent him being employed. (Id.). Nevertheless, Plaintiff asked for a referral to get a second opinion on his

disability evaluation. (Id. at 733). At that visit Dr. Solberg reported that Plaintiff was wearing gloves on his hands "to keep them warm." (Id. at 732). Once again Dr. Solberg reiterated that Plaintiff needed to go to the pain clinic. (Id. at 732). Noting that the pain clinic would likely wean Plaintiff off the narcotics, Dr. Solberg stated "I am under the impression that Mr. Booker does not wish to go to this evaluation." (Id.).

On March 22, 2006, Plaintiff called Dr. Solberg's office seeking another refill of Percocet. (Id. at 730). Dr. Solberg agreed to give Plaintiff a two-week supply of Percocet but stated "no further refills unless seen in the pain clinic, no exceptions." (Id.).

For depression and leg tremors, Dr. Solberg saw Plaintiff for a follow-up appointment on April 6, 2006. (Id. at 729). At that time, Plaintiff stated he was waiting for the pain clinic to set-up an appointment. (Id.). For prescriptions, Dr. Solberg prescribed Mirapex for Plaintiff's restless legs and increased Plaintiff's Lexapro for depression. (Id.). With regard to Plaintiff's Percocet, Dr. Solberg stated he was willing to continue the Percocet until Plaintiff was seen in the pain clinic, but if Plaintiff did not follow through with the pain clinic appointment, Dr. Solberg would not continue to prescribe the narcotic. (Id.).

After falling on the edge of his driveway, on April 20, 2006, Plaintiff visited Dr. Marc McGrath for his back pain. (Id. at 727). Because of the narcotic contract, Dr. McGrath discussed Plaintiff's case with Dr. Solberg who stated Plaintiff should not be given more narcotics. (Id.). Instead, Dr. McGrath gave Plaintiff an injection of Toradol and a prescription for Flexeril. (Id.). A few days later on April 24, 2006, Plaintiff called Dr. Solberg's office once again asking for a refill of Percocet and Soma. (Id. at 726). In response, Dr. Solberg authorized only a partial refill of the prescriptions. (Id.).

Noting his increasing concern with Plaintiff's narcotic use, Dr. Solberg examined Plaintiff on May 5, 2006. (Id. at 725). At that time Plaintiff still had not scheduled an appointment with the pain clinic and he was using his Percocet at a greater than anticipated rate. (Id.). Plaintiff reported that his back pain was increasing and his legs were tingling and Dr. Solberg diagnosed chronic back pain and potential narcotic abuse. (Id.). At the end of the appointment, Dr. Solberg informed Plaintiff he would not be given any additional narcotics if Plaintiff continued to take more Percocet than he was prescribed. (Id.).

At the next visit on May 19, 2006, Plaintiff reported to Dr. Solberg that he was experiencing an increasing amount of pain in his knuckles. (Id. at 724). Based on the physical examination and Plaintiff's previous rheumatology appointment, Dr. Solberg diagnosed degenerative joint disease and osteoarthritis. (Id.). For treatment Dr. Solberg recommended bathing the hands in cool water, followed by warm water and then gentle range of motion activities. (Id.). Dr. Solberg also advised Plaintiff to refrain from fine manipulation activities that would fatigue his hands. (Id.).

Plaintiff next visited Dr. Solberg on May 25, 2006, with a chief complaint of shoulder pain. (Id. at 722-23). After falling down some stairs, Plaintiff reported pain in his shoulder blades that worsened when lifting his arms. (Id. at 722). In examining Plaintiff, Dr. Solberg found an obvious muscle knot in the trapezius muscle but Plaintiff's range of motion was passively normal. (Id.). Dr. Solberg diagnosed a right trapezius muscle strain and recommended Plaintiff treat the shoulder with heat, stretching, and massage. (Id. at 723).

Plaintiff was finally was seen at the Mayo's Pain Rehabilitation Center on June 14, 2006. (Id. at 689-93). With respect to his back, Plaintiff described his pain as constant, burning, and shooting into his legs. (Id. at 690). Plaintiff described his hand pain as burning and reported that

his stomach pain varied in intensity from an ache, to sharp pain and pressure.  (Id.).  With regard to his neck, Plaintiff stated his pain was a burning, dull, ache, with a sharp pain when he turned his head.  (Id.).  Overall Plaintiff rated his pain as a six out of ten.  (Id.).  Plaintiff's symptoms were aggravated by physical activity, prolonged sitting and standing, driving, stress, weather changes, stairs, and lack of sleep, while his pain was alleviated with medication, rest, neuro stimulators, pillows, and elevating his legs.  (Id.).  At that time, Plaintiff was taking the following medications:  Trazadone daily at bedtime; Prednisone as needed; Soma four times per day; Albuterol inhaler daily; Percocet, up to four times per day; Adavair Diskus inhaler, twice per day; Zantac as needed; Imodium, eight times per day; Lomotil, eight times per day; Aspirin, daily; extra-strength Tylenol, eight times per day; and a nebulizer usually daily.  (Id. at 690-91).  Based on this information, the pain clinic determined Plaintiff would be a good candidate for a comprehensive pain rehabilitation program.  (Id. at 689, 692).

The next day Plaintiff called Dr. Solberg asking for a refill of his Percocet and reporting he had a pain clinic appointment on August 20.  (Id. at 721).  It does not appear Plaintiff informed Dr. Solberg of his appointment at the pain clinic the day before and therefore Dr. Solberg refilled the prescription.  (Id.).

Plaintiff's next appointment with Dr. Solberg was on June 27, 2006 and his main complaint was pain along the right-side of his torso, chest tightness, and shortness of breath.  (Id. at 719-20).  Reviewing CT scans of Plaintiff's chest and abdomen, Dr. Solberg noted Plaintiff had some small cysts on his liver, but the CT scan was otherwise unremarkable.  (Id. at 719).  Plaintiff continued to complain of hand pain and Dr. Solberg noted Plaintiff had "quite mild" degenerative hand changes.  (Id. at 720).  For the chronic pain, Dr. Solberg referred Plaintiff to physical therapy.  (Id.).

At the follow-up visit on July 31, 2006, Plaintiff continued to feel chest pain and tightness. (Id. at 717-18). Dr. Solberg compared Plaintiff's CT scans with the scans performed in May of 2005 and noted there were no changes. (Id. at 717). At that time Plaintiff's pain symptoms were stable with his current treatments. (Id.). For the chest tightness Dr. Solberg recommended additional testing with the cardiology department. (Id. at 718).

William Schnell, a Physician's Assistant, saw Plaintiff on August 4, 2006 at Mayo's Interventional Cardiovascular Department. (Id. at 686-88). After blood tests, x-rays and an electrocardiogram, Plaintiff was diagnosed with minimal to mild coronary artery disease and atypical chest pain, non-cardiac in origin. (Id. at 687). For treatment, Mr. Schnell recommended that Plaintiff try to lose weight and participate in a chronic pain program. (Id. at 688).

On August 25, 2006, Plaintiff returned to Dr. Solberg for his back pain and chest tightness. (Id. at 715-16). Once again, Plaintiff reported that his back pain was worsening and he stated he had difficulty moving and conducting daily activities. (Id. at 715). Blood tests showed Plaintiff's liver enzymes were elevated, likely because of his heavy narcotic and Tylenol use. (Id.). Questioning if Plaintiff was malingering, Dr. Solberg informed Plaintiff he was going to taper Plaintiff off the narcotic pain medications. (Id.).

On September 26, 2006, Plaintiff returned to Dr. Solberg. (Id. at 713-14). Having fallen on his riding lawnmower, Plaintiff reported increased pain in his back and hands, although the physical examination of Plaintiff's back remained unchanged. (Id. at 713). Dr. Solberg agreed with the pain clinic that Plaintiff needed a pain rehabilitation program. (Id. at 714).

A month later Plaintiff returned to Dr. Solberg to follow-up on his chronic pain, reporting his pain had increased with the decreased Percocet dose. (Id. at 712). Plaintiff reported that his shortness of breath had worsened and he had a productive cough. (Id.). Dr. Solberg diagnosed

bronchitis and prescribed Robitussin and an antibiotic. (Id.). For Plaintiff's pain issues, Dr. Solberg switched Plaintiff's Percocet with Vicodin. (Id.).

On November 1, 2006, Plaintiff called Dr. Solberg's office asking to increase his pain medication or to switch back to the Percocet. (Id. at 711). Dr. Solberg declined to change Plaintiff's medication, stating Plaintiff's "pain will get worse before it gets better." (Id.).

Reporting he had a seizure, on November 6, 2006, Plaintiff called Dr. Solberg's office asking for more pain medication. (Id.). Dr. Solberg's office told Plaintiff to come in for an appointment. (Id.).

Plaintiff's attorney sent a letter to Dr. Kelly on December 7, 2006, asking him to provide an opinion concerning Plaintiff's conditions for the upcoming ALJ hearing. (Id. at 682-85).

In order to "re-establish primary care," Plaintiff returned to Dr. Kelly on December 11, 2006. (Id. at 762-765). Dr. Kelly first noted Plaintiff's extensive medical history, including his chronic back, neck and abdominal pain. (Id. at 762). Based on Plaintiff's self-report that he could walk only 50 feet, Dr. Kelly concluded Plaintiff's pain limited his ambulatory abilities. (Id. at 762). Dr. Kelly further reported that Plaintiff "told him" he had COPD, chronic diarrhea, and plantar fasciitis. (Id. at 764). Dr. Kelly renewed Plaintiff's prescriptions for Amitriptyline, Advair, Lexapro, Prednisone, Percocet, and Trazadone and agreed to fill-out paperwork for Plaintiff's disability application. (Id. at 765).

Responding to Plaintiff's attorney, Dr. Kelly provided a disability opinion on December 19, 2006. (Id. at 678-681). At the outset Dr. Kelly noted he had reviewed Plaintiff's medical records from other doctors. (Id. at 678). As for Plaintiff's impairments, Dr. Kelly stated that Plaintiff suffered from hand dermatitis, chronic abdominal pain, significant back pain that is "nearly incapacitating," chronic neck pain, COPD, chronic diarrhea, depression, right knee pain

related to degenerative disc disease, recurrent prostatitis, B-12 deficiency, and plantar fasciitis. (Id. at 678-80).  Based on these impairments, Dr. Kelly opined that Plaintiff would be subject to the following limitations:  no repetitive activities; lifting no more than ten pounds on an infrequent basis; a need to change positions more frequently than every 30 minutes; a need to lie down frequently during the day; access to a bathroom; a need to wear gloves at all times; limited contact with metals and other substances aggravating Plaintiff's dermatitis; no grasping or fine manipulation when Plaintiff had a flare-up of the dermatitis, no twisting, stooping, or bending; no exposure to a smoky environment or noxious fumes; no cold environments; and the ability to access his home nebulizer.  (Id. at 680).

Complaining of a cough, Plaintiff treated with Dr. Kelly on December 20, 2006.  (Id. at 761).  Plaintiff's chest showed coarse breath sounds and Dr. Kelly diagnosed bronchitis/COPD. (Id.).  He prescribed Cipro and Codiclear and advised Plaintiff to quit smoking.  (Id.).

Plaintiff went to the emergency room on January 3, 2007, for a flare-up of his back-pain and was given acetaminophen and Oxycodone.  (Id. at 760).

Plaintiff returned to Dr. Kelly for his pain on January 12, 2007.  (Id. at 760).  Plaintiff requested an increase in his acetaminophen/Oxycodone dose and Dr. Kelly agreed.  (Id.).

**C.  Evidence from the Medical Expert**

A medical expert (ME), Dr. Andrew Steiner, testified at the administrative hearing.  (Id. at 808-26).   Dr. Steiner stated that Plaintiff had the following medically determinable impairments:  obesity, gastric bypass surgery and resulting dumping syndrome, B12 deficiency, COPD – perhaps related to tobacco use, asthma, history of chest injury, abdominal pain, history of gunshot wounds to abdomen, neck pain with some osteoarthritis changes, history of cancer of the mandible, low back pain with some degenerative changes, hand rashes from allergic

reactions, multiple allergies, history of diabetes, possible fibromyalgia, history of seizures, history of synovitis of the right hand without documentation of any ongoing limitations, history of left finger injury, mallet deformity in the left fifth finger without documentation of ongoing limitations, right knee pain, foot pain attributed to plantar fasciitis, tobacco use, depression, and chronic pain syndrome. (Id. at 808-11). In his testimony Dr. Steiner noted there was not any medical documentation supporting Plaintiff's complaints of elbow pain and problems falling. (Id. at 811). Likewise Dr. Steiner concluded there was no medical evidence indicating any ongoing finger/hand conditions that would result in problems with normal gripping or fine finger activities. (Id. at 811, 825).

Dr. Steiner stated the medical records included several comments that Plaintiff was possibly malingering and had pain focused behavior, as well as, a history of drug-seeking behavior and narcotic withdrawal. (Id. at 811). While Plaintiff had sought treatment for possible coronary artery disease, Dr. Steiner indicated the medical records showed minimal artery changes and did not show any residual effects of coronary or myocardial infarction and therefore, Dr. Steiner would not list coronary artery disease as a limiting condition. (Id. at 812). With regard to Plaintiff's allergies, Dr. Steiner noted that Plaintiff's testing did not include a "96-hour read" and therefore the test "[could not] be considered a reliable test as far as identifying allergens." (Id.). Finally, Dr. Steiner stated the medical records did not show any evidence of gait instability or any medical condition that would mandate use of a cane. (Id. at 816).

In response to questions from the ALJ, Dr. Steiner testified he did not believe that Plaintiff's impairments met or equaled a listed impairment. (Id. at 813). In evaluating Plaintiff's residual functional capacity (RFC), Dr. Steiner concluded that Plaintiff could work at a light exertional level but with the following additional restrictions: Plaintiff should be able to wear

gloves and should avoid moisture situations, metals, and solvents.  (Id. at 814-15).  In response

to questioning by Plaintiff's attorney, Dr. Steiner acknowledged it would be important for the

Plaintiff to have close access to a bathroom facility.  (Id. at 817).  Dr. Steiner also opined that

plantar fasciitis was manageable with treatment and was self-limiting, lasting less than 12

months in duration.  (Id. at 822).  Finally, Dr. Steiner determined there was no evidence in the

medical records supporting a limitation on bending, twisting, or stooping.  (Id. at 825).

### D.    EVIDENCE FROM THE VOCATIONAL EXPERT

A vocational expert (VE), Robert Brezinski, also testified at the hearing.  (Id. at 826-35).

The ALJ asked Mr. Brezinski to consider a hypothetical person of 51 years of age, but who was a

younger individual as of the alleged onset date of disability, with a high school education and

past work experience as a security guard and computer technician.  (Id. at 828).  The

hypothetical person suffered from the following impairments:  history of obesity; history of

gastric bypass surgery with dumping syndrome; chronic obstructive pulmonary disease; reports

of abdominal pain, possibly secondary to a past gunshot wound; osteoarthritic changes in the

cervical spine; history of cancer; coronary artery disease with mild changes; degenerative

changes of the lumbar spine; deconditioning; osteoarthritis in the hands; dermatitis;

fibromyalgia; allergies; history of seizure disorder; synovitis in the right hand; left or right knee

pain; plantar fasciitis; and mental impairments of depression; chronic pain syndrome; possible

malingering; and possible drug seeking behavior.  (Id.).  The ALJ then directed the VE to

consider the person to be at the light exertional level with the following limitations:  lifting 20

pounds occasionally and ten pounds frequently; standing or walking for up to six hours; sitting

for up to two hours in an eight hour day; a position within a few feet from a bathroom, no direct

contact with moisture or exposure to high concentrations of airborne contaminants; no operating

hazardous machinery; and no prolonged contact with fragrance, parabens, cobalt, paraphenolendiamine, quaternium, black rubber or formaldehyde. (<u>Id.</u> at 828-29). In response to this hypothetical, Mr. Brezinski opined that such a person could return to Plaintiff's past relevant work as a security guard but not as a computer technician. (<u>Id.</u> at 829).

The ALJ then directed the VE to consider adding to the hypothetical the additional restriction of wearing cotton gloves during exacerbations of dermatitis. (<u>Id.</u>). Even with this additional restriction, the VE testified that the hypothetical person would be able to work as a security guard. (<u>Id.</u>). The ALJ next asked the VE to add to the hypothetical that the individual could only perform unskilled work. (<u>Id.</u> at 831). With this additional restriction, the VE testified that the hypothetical individual would not be able to perform Plaintiff's past relevant work, but could perform positions as an assembler, mail clerk, or office clerk. (<u>Id.</u> at 832-33). The VE stated that wearing non-latex rubber gloves would not change his opinion, but wearing cotton gloves would limit an individual in the jobs he previously mentioned. (<u>Id.</u> at 33). The VE then stated that the mail clerk and officer clerk positions would be eliminated if the hypothetical included a restriction of no work with paper products. (<u>Id.</u> at 834). Finally, if a restriction of no fine manipulation was added to the hypothetical, the VE indicated the number of possible assembly jobs in the economy would be reduced to 1,500 to 2,000. (<u>Id.</u> at 835).

The ALJ also asked the VE to consider the same hypothetical person with the limitation of needing access to the bathroom every 30 minutes and the VE stated "[t]hat's going to be very marginal. So I mean that would make someone very marginal for competitive work." (<u>Id.</u>). Similarly, the VE testified that if the hypothetical individual was required to lay down frequently throughout the day, the individual would be precluded from competitive work. (<u>Id.</u>).

The ALJ also directed the VE to consider a second hypothetical individual with the same impairments with the following limitations: "unable to lift more than ten pounds infrequently [sic]; a need to change positions more frequently than every 30 minutes; would need to lie down frequently during the day; could not perform repetitive activities; would need to wear gloves at all times; would be unable to bend, twist, or stoop; would be unable to work in any smoky environment or environment with noxious fumes, no access to cold; and would need to use a nebulizer at least four times per day." (Id. at 829-30). Given those limitations, the VE concluded that the hypothetical person could not perform any of Plaintiff's past relevant work and the limitations would preclude all competitive work. (Id. at 830).

E.     **THE ALJ'S DECISION**

The Administrative Law Judge, Mary Kunz, employed the required five-step sequential evaluation in her opinion: (1) whether the claimant had engaged in substantial gainful activity; (2) whether the claimant had a severe impairment; (3) whether the claimant's impairment met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant was capable of returning to past work; and (5) whether the claimant could do other work existing in significant numbers in the regional or national economy. 20 C.F.R. § 404.1520(a)-(f).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the onset date of March 3, 2003. (Admin. R. at 21). At step two, the ALJ found that Plaintiff had severe impairments of: history of gastric bypass surgery with ongoing obesity; deconditioning; degenerative changes of the cervical and lumbar spine; early osteoarthritic changes in the hands; degenerative changes in the right knee, asthma and/or COPD; possible fibromyalgia; chronic pain syndrome; coronary artery disease; history of seizures; allergies; and

dermatitis.  (Id. at 22).  The ALJ also considered the effect of Plaintiff's obesity on Plaintiff's impairments.  (Id.).  The ALJ concluded that Plaintiff had non-severe impairments of:  history of cancer; history of gunshot wounds to abdomen; plantar fasciitis; resting tremor; past seizure disorder; past pneumonia and prostatitis.  (Id. at 23).  The ALJ based her conclusion that these impairments were not severe on the fact that there was no evidence in the medical records that these conditions caused continuing problems or limitations for plaintiff and that plantar fasciitis could not be expected to last for more than twelve months.  (Id.).  The ALJ also concluded that Plaintiff's depression was not a severe impairment because Plaintiff did not have any recent prescriptions for depression, and had not seen a psychiatrist or psychologist.  (Id.).

At the third step, the ALJ concluded that none of Plaintiff's impairments or combination of impairments met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Id. at 24).  With regard to Plaintiff's musculoskeletal impairments, the ALJ observed that these did not result in any clinical signs or diagnostic findings consistent with a listing-level condition, and Plaintiff did not have any neurological loss or difficulties ambulating.  (Id. at 24). Likewise, the ALJ noted that the ME testified that Plaintiff's pulmonary, coronary and skin conditions did not meet the criteria for any listing.  (Id.).  While there is no listing for obesity, the ALJ determined that even when considering Plaintiff's obesity in combination with his other physical impairments, the condition did not meet or equal a listed impairment.  (Id.).  The ALJ confirmed she gave "significant" weight to the ME's testimony because he was an experienced physician, was board certified in physical medicine and rehabilitation, and had knowledge of the Social Security disability regulations.  (Id.).

Turning to step four, the ALJ found that Plaintiff had the residual functional capacity:

> to perform light work involving lifting 20 pounds occasionally and
> 10 pounds frequently, sitting two hours and standing/walking six

> hours in an eight hour workday, with no exposure to moisture or high concentrations of pollutants, no driving or work around hazardous machinery, no prolonged handling of or direct contact with nickel, chromium, fragrance, parabens, cobalt, paraphenylenediamine, quaternium, black rubber, or formaldehyde, that would accommodate wearing gloves, and which would provide close access to a bathroom about once per hour.

(Id. at 24). In formulating this RFC, the ALJ reviewed and analyzed the Polaski factors regarding Plaintiff's credibility, including Plaintiff's testimony about his pain and symptoms, Plaintiff's daily activities, the objective medical evidence, Plaintiff's treatment history, factors aggravating and alleviating Plaintiff's pain, and Plaintiff's prescription use. (Id. at 24-31). After this thorough analysis, the ALJ concluded Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Id. at 26). The ALJ described the objective medical evidence at length and explained her conclusions that the medical evidence did not support the allegedly disabling conditions. (Id. at 31-32). While the ALJ determined that Plaintiff's complaints of pain and restrictions from his allergies, dermatitis and diarrhea were not entirely credible, she nevertheless still incorporated restrictions from those conditions in her RFC determination. (Id. at 27). With respect to Plaintiff's complaints of disabling back, neck, knee, hand, and foot pain, the ALJ "[found] no evidence to support the degree of symptoms alleged." (Id. at 28). Rather, citing to physician opinions in the record, the ALJ concluded that Plaintiff's pain complaints were the result of drug seeking behavior. (Id. at 28-30). The ALJ gave little weight to the opinion of Dr. Kelly because Dr. Kelly "based his opinion on one visit after two and a half years of non-treatment, and his conclusions are inconsistent with the record as a whole." (Id. at 30). At the fifth step, the ALJ determined that, based on the above RFC, Plaintiff could perform his past relevant work as a

security guard and that there were significant jobs in the national economy that a person with Plaintiff's age, education, work experience, and RFC could perform.  (Id. at 31-33).

## II.  <u>STANDARD OF REVIEW</u>

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability."  <u>Locher v. Sullivan</u>, 968 F.2d 725, 727 (8th Cir. 1992).  "Disability" under the Social Security Act is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  The claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  <u>Id.</u> § 423(d)(2)(A).  The impairment must have lasted or be expected to last for a continuous period of at least twelve months, or be expected to result in death.  <u>Id.</u> § 423(d)(1)(A).

### A.  ADMINISTRATIVE REVIEW

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision.  20 C.F.R. § 404.909(a)(1).  A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ.  <u>Id.</u> § 404.929.  If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, although review is not automatic.  <u>Id.</u> §§ 404.967-.982.  The decision of the Appeals Council, or of the ALJ if the request for review is denied, is final and binding upon the claimant unless the matter is appealed to a federal district court within sixty days after notice of the Appeals Council's action.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. § 404.981.

## B.   JUDICIAL REVIEW

Judicial review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence in the record as a whole.   Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005); Hutsell v. Sullivan, 892 F.2d 747, 748-49 (8th Cir. 1989).   Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).  The review is "more than a mere search of the record for evidence supporting the [Commissioner's] finding."  Brand v. Sec'y of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).  Rather, "the substantiality of evidence must take into account whatever in the record fairly detracts from its weight."  Id. (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Kirby v. Sullivan, 923 F.2d 1323, 1326 (8th Cir. 1991).

The reviewing court must review the record and consider:

1.   The credibility findings made by the ALJ;
2.   The plaintiff's vocational factors;
3.   The medical evidence from treating and consulting physicians;
4.   The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;
5.   Any corroboration by third parties of the plaintiff's impairments; and
6.   The testimony of vocational experts when required, which is based upon a proper hypothetical question which sets forth the claimant's impairments.

Johnson v. Chater, 108 F.3d 942, 944 (8th Cir. 1997) (citing Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).  A court may not reverse the Commissioner's decision simply because substantial evidence would support an opposite conclusion.  Tellez, 403 F.3d at 956; Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984).  In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact.  Woolf v. Shalala, 3 F.3d

1210, 1213 (8th Cir. 1993). Instead, the court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

Plaintiff contends that the Commissioner argues for an inappropriate standard of review because he "focuses exclusively on the parts of the record [supporting the ALJ's decision], to the exclusion of any other evidence." (Pl.'s Reply to Def.'s Summ. J. Mot. at 1). However, the Commissioner's citation to the record is appropriate because, if it is possible to draw two inconsistent positions from the evidence and one of those positions supports the Commissioner's decision, the court must affirm that decision. Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).

## III. <u>DISCUSSION</u>

In the instant case, Plaintiff contends that the Commissioner's decision is erroneous because: (1) the ALJ failed to give adequate consideration to whether Plaintiff's multiple impairments met or equaled a listing; (2) the ALJ did not give sufficient weight to Plaintiff's treating physicians; and (3) Plaintiff's reliance on narcotic pain medication does not justify discounting Plaintiff's credibility. This Court concludes that the ALJ did not err in assessing Plaintiff's credibility or in discounting the weight of certain treating physician opinions. Nor did the ALJ err in finding that Plaintiff's multiple impairments did not meet or equal a listing. Because the ALJ's comprehensive analysis and opinion are supported by substantial evidence, Plaintiff's motion should be denied and Defendant's motion granted.

### 1. Listings

Plaintiff acknowledges that his individual impairments do not "meet" any of the listings. (Pl.'s Memo. in Supp. of Mot. for Summ. J. at 9-11, hereinafter "Pl.'s Memo."). Plaintiff

contends, however, that the ALJ did not give adequate consideration to the question of whether Plaintiff's impairments were nevertheless equivalent to a listed impairment. (Id.). This Court disagrees.

It is the Plaintiff's burden of proof to establish that his or her impairment meets or equals a listed impairment. Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004). A listing is met when an impairment meets all of the listing's specified criteria. Id. An impairment is medically equivalent to a listed impairment if it is at least equal in severity and duration to the criteria of any listed impairment. 20 C.F.R. § 404.1526(a). A finding that an impairment equals a listing must be based on medical evidence and symptoms alone are insufficient. 20 C.F.R. § 404.1526(b); Finch v. Astrue, 547 F.3d 933, 938 (8th Cir. 2008); Johnson, 390 F.3d at 1070. The Social Security Act also requires an ALJ to consider the combined effect of all the claimant's impairments, without regard to whether any such impairment, if considered separately, would be of sufficient medical severity to be disabling. 20 C.F.R. § 404.1523; Cunningham v. Apfel, 222 F.3d 496, 501 (8th Cir. 2000) (citing Delarosa v. Sullivan, 922 F.2d 480, 484 (8th Cir. 1991)).

The regulations provide three ways to show medical equivalency. 20 C.F.R. § 404.1526(b). First, medical equivalency can be established when a person has an impairment described in Appendix 1, but does not exhibit one or more of the findings specified in the listing. Id. It can also be shown where a person exhibits all of the findings, but one or more findings are not as severe as specified in the listing. Id. In these situations, equivalence will be found where the claimant has other findings related to her impairments that are of equal medical significance to the required criteria. 20 C.F.R. § 404.1526(b)(1)(ii). If the plaintiff suffers from an impairment that is not described in the listings, a second way to show equivalency to a listed

impairment is by presenting medical findings equal in severity to all the criteria for the one most similar listed impairment. <u>Marciniak v. Shalala</u>, 49 F.3d 1350, 1353 (8th Cir.1995); 20 C.F.R. § 404.1526(b)(2). The third way to show equivalency applies where a Plaintiff has a combination of impairments, none of which meets a listing. 20 C.F.R. § 404.1526(b)(3). In that situation, there is medical equivalence when the findings related to all the plaintiff's impairments are at least of equal medical significance to those of a listed impairment. <u>Id.</u>

Plaintiff contends that while his impairments do not meet all of the medical criteria for any listed impairment, in combination his impairments are medically equivalent to listing 1.02, major dysfunction of a joint[11] and 1.04, disorders of the spine.[12] Plaintiff states his abdominal

---

[11] A major dysfunction of a joint is characterized by a gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s), along with:

    A.    Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; OR

    B.    Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

29 C.F.R. § 404, subpart P, Appendix 1.02.

[12] A disorder of the spine includes impairments such as herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or vertebral fracture, resulting in compromise of a nerve root (including the cauda equina) or the spinal cord, along with:

    A.    Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); OR

    B.    Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; OR

    C.    Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

pain, dermatitis, seizures, COPD/asthma, and possible fibromyalgia "could act in combination with his spinal and joint impairments to affect Mr. Booker's ability to walk, stand, bend or use his arms/hands for work activities." (Pl.'s Memo. at 10). However, it is Plaintiff's burden to establish medical equivalency. Other than the conclusory statement in his brief, Plaintiff did not offer any medical evidence to support his assertion that his combined impairments affected his ability to walk or use his hands and arms. In contrast, the ALJ's decision that Plaintiff's impairments did not equal these listings is supported by substantial medical evidence. As the ALJ recognized, there is no medical evidence in the record to support Plaintiff's contention that he could not ambulate effectively. In October 2003, Dr. Martin stated Plaintiff did not have any difficulties ambulating. (Admin. R. at 253). Nothing in Dr. Gelfman's December 2005 disability examination reveals that Plaintiff had difficulties ambulating and in fact, Dr. Gelfman stated Plaintiff had functional motions in the major arm and leg joints and Plaintiff was able to independently stand. (Id. at 700-01). While there are some objective findings that Plaintiff has mild degenerative changes in his spine and knee, Dr. Gelfman concluded these impairments would not make Plaintiff disabled, only that they might preclude Plaintiff from "heavy work." (Id. at 700-01). Dr. Gelfman did not conclude Plaintiff would have any difficulties ambulating or engaging in gross or fine finger movements. The medical records instead establish that Plaintiff's spinal problems did not result in nerve root compression, neurological loss, or spinal stenosis, the conditions found in the listing. (Id. at 252, 537, 568-69, 695). The ALJ also correctly considered the combined effect of all of Plaintiff's impairments, including obesity. (Id. at 24). While the record reflects that Plaintiff does suffer from degenerative joint changes and other impairments, there is substantial evidence to support the ALJ's conclusion that Plaintiff's

---

29 C.F.R. § 404, subpart P, Appendix 1.04.

impairments do not meet listing 1.02 or 1.04 because there are no medical findings comparable in kind or severity to the listings.

## 2.     Treating Physicians

The second error alleged by Plaintiff is that the ALJ disregarded the opinions of certain treating physicians in favor of the opinion of the medical expert.  (Pl.'s Memo in Supp. of Summ. J at 9, 11-12).  Plaintiff mentions or cites to opinions or medical records of five treating physicians: Drs. Martinez, Cohen, Ouellette, Gelfman and Kelly.  This Court concludes that the ALJ did not error in her analysis regarding the weight given to the opinions of these physicians.

In evaluating a medical opinion, an ALJ must consider the following factors:  (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; and (5) whether the treating physician is also a specialist.  20 C.F.R. § 404.1527(d).  The same factors apply to opinions of a testifying medical expert.  20 C.F.R. § 404.1527(f)(2)(iii).  A treating physician's opinion is typically entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory and diagnostic techniques and is not inconsistent with other substantial evidence in [the] record."  Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000)); 20 C.F.R. § 404.1527(d)(2).  The ALJ may credit other medical opinions over that of a treating physician when such opinions are supported by better evidence or the treating physician has rendered inconsistent opinions.  Prosch, 201 F.3d at 1013; Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001).  Similarly, an ALJ may disregard an opinion that "consist[s] of nothing more than vague, conclusory statements."  Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996); Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991).  Conversely, an ALJ cannot assess a

claimant's RFC by relying only on the opinions of non-treating physicians because such opinions do not constitute substantial evidence. <u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000).

### A.    Dr. Martinez

Plaintiff states in his brief, "[i]n the case of Mr. Booker, a number of physicians including Dr. Martinez . . . have over the years had a chance to examine him and identify his functional limitations." (Pl.'s Memo. in Supp. of Summ. J. at 11). Plaintiff does not cite to any specific medical opinion or functional limitation opinion from Dr. Martinez.

First, this Court concludes that Dr. Martinez should not be given the same level of deference given to a treating physician who sees a patient regularly. Rather, Dr. Martinez's contact with Plaintiff is more analogous to that of a consulting physician. Plaintiff visited Dr. Martinez only once, as compared with Plaintiff's other ubiquitous medical contacts, and Plaintiff saw Dr. Martinez only for a cardiovascular consult in anticipation of surgery. (Admin. R. at 638-40). Further, Dr. Martinez did not offer any medical opinions regarding Plaintiff's functional limitations. (<u>Id</u>.). The only functional limitations contained within the medical record from Dr. Martinez are Plaintiff's self reports of his abilities to walk and climb stairs.[13] (<u>Id</u>. at 638). Because Dr. Martinez saw Plaintiff only once and because he did not offer an opinion on Plaintiff's limitations, the ALJ did not err in her assessment of Dr. Martinez's medical notes.

### B.    Drs. Cohen and Ouellette

Plaintiff contends that the ALJ disregarded the opinions of Dr. Cohen and Dr. Ouellette that: (1) Plaintiff should avoid "all" contact with heavy metals and other exposures, not just "prolonged contact;" and (2) Plaintiff was disabled from performing his past work as a security guard. (Pl.'s Memo. at 11, citing Admin. R. at 352). This Court finds that the ALJ did not err in her assessment of Plaintiff's RFC with respect to his allergies and dermatitis because: (1) the

---

[13] The Court analyzes Plaintiff's credibility regarding his functional limitations *infra*.

ALJ's RFC is consistent with the opinions of the treating physicians; and (2) to the extent that Drs. Cohen and Ouellette opined about Plaintiff's ability to perform his past work, the ALJ was not required to give controlling weight to the opinion.

The functional limitation imposed by Dr. Cohen is not as specific as Plaintiff suggests. Dr. Cohen stated, Plaintiff "is to avoid the heavy metal exposures and other exposures, particularly any nickel related exposures." (Admin. R. at 352). Neither Dr. Cohen nor Dr. Ouellette opined about what level of contact with these allergens would be appropriate. In September 2003, Dr. Appert stated Plaintiff should "strictly avoid" the substances at issue. (Id. at 532). However, Dr. Appert went on to state that when Plaintiff was to have contact with an allergen he should wear gloves. (Id. at 532).

It does not appear to this Court that any physician used the phrase "no prolonged exposure" in describing what level of contact with allergens Plaintiff could tolerate. Contrary to Plaintiff's assertion, however, that is not the only dermatitis restriction the ALJ included in the RFC. Rather the RFC provides that Plaintiff would have "*no* exposure to moisture or high concentrations of pollutants . . . no prolonged handing of *or direct contact* with . . ." (Admin. R. at 24) (emphasis supplied). Throughout the medical records Plaintiff's impairment was described by his treating physicians as "contact" dermatitis. The ALJ's RFC restricting Plaintiff from "direct contact" with the allergens and allowing the Plaintiff to wear gloves accounts for the functional limitation suggested by Drs. Cohen, Appert and Ouellette, and the ALJ did not disregard the opinions of these treating physicians.

It appears Plaintiff also contends that the ALJ erred in not giving controlling weight to the opinions of Dr. Cohen and Dr. Ouellette that Plaintiff could not work as a security guard because of his dermatitis. However, it is clear that these doctors' opinions were specific to

Plaintiff's ability to return to work as a security guard at Ho-Chunk casino handling and being exposed to large amounts of metal and nickel and where he was prohibited from wearing gloves. (Id. at 353, 355, 357). The ALJ acknowledged this fact in her analysis and noted that Dr. Ouellette's opinion was given for purposes of a worker's compensation claim for Plaintiff's employment with Ho-Chunk. However, the fact that a plaintiff is precluded from a particular past job, does not mean the plaintiff is precluded from all his or her past relevant work. Wagner v. Astrue, 499 F.3d 842, 853 (8th Cir. 2007) (citing Martin v. Sullivan, 901 F.2d 650, 653 (8th Cir. 1990)). While the doctors opined about Plaintiff's ability to work as a casino security guard, they did not offer an opinion on Plaintiff's ability to work as any other type of security guard.

Further, to the extent the ALJ disregarded the allergy doctors' opinions that Plaintiff was disabled from working as a security guard, the ALJ was not required to give such opinion controlling weight. While a treating physician's medical opinion is entitled to controlling weight, the issue of whether a claimant is disabled is a determination reserved for the Commissioner and a statement by a medical source regarding disability is not dispositive and not entitled to the same weight as other medical opinions. 20 C.F.R. §§ 404.1527(e)(1) and (3); 416.927(e)(1) and (3). "Treating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the [Commissioner]." Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) (internal quotations omitted) (quoting Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir.2002)); see also Ellis v. Barnhart, 392 F.3d 988, 994-95 (8th Cir. 2005); Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th

Cir. 1991). Drs. Cohen's and Ouellette's opinion that Plaintiff was disabled from working as a security guard is a decision for the Commissioner and not a medical question.

Finally, the ALJ set forth specific reasons for disregarding the allergy doctors' opinions that Plaintiff could not perform his past work as a security guard: Plaintiff had not sought treatment for dermatitis since 2003; Plaintiff did not follow-through with obtaining a 96-hour read allergy test; Plaintiff did not experience repeated flare-ups of dermatitis after 2003 as evidenced by the opinion of Dr. Steiner and the medical records of Drs. Appert, Taylor, and Michet; and Dr. Appert concluded that Plaintiff's dermatitis was controlled with Prednisone. The ALJ's RFC limitations resulting from Plaintiff's allergies and dermatitis are supported by substantial evidence in the record and the Commissioner's decision should be upheld.

### C.      Dr. Gelfman

With respect to Dr. Gelfman, Plaintiff appears to contend the ALJ erred by rejecting Dr. Gelfman's opinion that Plaintiff could not return to his past work as a security guard. (Pl.'s Memo. J. at 11). Dr. Gelfman was not as specific as Plaintiff suggests in his opinion about Plaintiff's ability to work as a security guard. Dr. Gelfman was much more equivocal, "[i]t is *possible* that he has a contact dermatitis to metals and other materials that he *might* be exposed to in a casino making it *possible* that he is disabled in regards to performing security in a casino." (Admin. R. at 701) (emphasis supplied). Beyond the hesitancy Dr. Gelfman expressed in this statement, the ALJ was not required to treat this opinion as conclusive for the same reasons the ALJ did not have to rely on the opinions of Drs. Cohen and Ouellette. The issue of whether Plaintiff was disabled from working as a security guard is a decision for the ALJ and Dr. Gelfman's opinion is only specific to Plaintiff's work as a casino security guard, not security guard positions generally.

### D. Dr. Kelly

Plaintiff also challenges the ALJ's decision to give little weight to the opinion of Dr. Kelly regarding Plaintiff's exertional limitations. Plaintiff argues, "[t]he ALJ . . . did not explain why she would reject the observations and opinions of Mr. Booker's treating physicians that would support a restriction below the sedentary level." (Pl.'s Memo. in Supp. of Mot. for Summ. J. at 11). First, contrary to Plaintiff's assertion, only one treating physician, Dr. Kelly, suggested plaintiff had an exertional limitation below the sedentary level. (Admin. R. at 30). Additionally, the ALJ conducted a thorough and well-supported analysis of why she rejected Dr. Kelly's opinion. (Id. at 30-31).

Plaintiff is correct that in December of 2003, Dr. Kelly opined that Plaintiff's "limitations at work would involve extremely sedentary activity, frequent position changes, no bending, twisting, reaching, climbing, pushing or pulling" and no lifting more than ten pounds. (Admin. R. at 334). Three years later, in December 2006, Dr. Kelly opined that Plaintiff would be subject to the following exertional limitations: no repetitive activities; lifting no more than ten pounds on an infrequent basis and a need to change positions more frequently than every 30 minutes. (Id. at 680). While the ALJ considered Dr. Kelly's opinion, after a detailed analysis she gave it little weight. (Id. at 30).

In evaluating the length, nature, and extent of the treatment relationship, the ALJ noted that Dr. Kelly's December 2006 opinion was based on a single visit after two and a half years of non-treatment. Under these circumstances, Dr. Kelly's December 2006 opinion cannot be given the same level of deference as a treating physician who had examined Plaintiff consistently. Additionally, both of Dr. Kelly's opinions were only provided to Plaintiff after he ceased seeing other treating physicians, Dr. Martin and Dr. Solberg, because of their concerns over his narcotic

use.  (Id. at 30).  Further, Plaintiff's attorney only sought an opinion from Dr. Kelly after Plaintiff was dissatisfied with the disability opinion provided by Dr. Gelfman.

The ALJ acknowledged that Dr. Kelly's opinion was not supported by the evidence in the record.  At the visit preceding his 2006 disability opinion, Dr. Kelly's only physical examination remarks about Plaintiff's neck and back problems were that Plaintiff's neck was supple and there was no evidence of thyromegaly or adenopathy.  (Admin. R. 764).  Notably, Dr. Kelly's examination notes and disability opinion repeatedly rely on Plaintiff's self-reported medical history, diagnoses, and functional impairments.  (See e.g. Admin. R. at 679 "the patient reports he also has chronic neck pain;" at 764, "he tells me he has rheumatoid arthritis," "he tells me he can have diarrhea up to 20 times per day," "he tells me he has plantar fasciitis").  An ALJ may give less weight to a physician whose opinions are based on subjective complaints rather than objective medical evidence.  Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007).  As the ALJ recognized, Dr. Kelly's opinion is conclusory and not based on any objective medical information.

In contrast, numerous other physicians confirmed that there was little objective medical evidence of Plaintiff's limitations.  A September 2004 MRI of Plaintiff's spine showed only mild, minimal changes.  (Admin. R. at 563; see also 254, 255, 561-62).  The medical expert, Dr. Steiner, opined that the mild degenerative changes were common in people over the age of fifty.  (Id. at 816).  The X-rays and MRIs of Plaintiff's knees showed only mild degenerative changes.  (Id. at 196).  Unlike Dr. Kelly who was a family practitioner, Dr Gelfman was a physical rehabilitation specialist.  Dr. Gelfman concluded that the cervical and lumbar spondylosis revealed in the MRI were not entirely disabling and would only preclude Plaintiff from "heavy work."  (Id. at 701).  Dr. Solberg, who truly was Plaintiff's treating physician, agreed with Dr.

Gelfman's disability opinion and noted Plaintiff's objective medical tests only showed "quite mild" degenerative changes in Plaintiff's spine. (Id. at 720, 731). Numerous doctors, including Drs. Taylor, Solberg, and Michet concluded from examination that Plaintiff had normal range of motion in his extremities. (Id. at 664, 694). In the 2005 disability examination completed by Dr. Taylor, his only functional restriction was that Plaintiff should not walk, stand, or lift for "long periods of time." (Id. 662).

Additionally, Dr. Kelly's disability opinions are inconsistent with his own treatment notes. In June of 2003, Dr. Kelly noted Plaintiff had a "little" back tenderness. (Admin. R. at 176). Dr. Kelly's August 2003 examination of Plaintiff's back was "unremarkable" other than a small limitation in forward flexion. (Id. at 172). During Dr. Kelly's December 2003 disability examination, he stated Plaintiff had a "mild" limitation in neck range of motion and asserted Plaintiff was "somewhat" tender over the lumbar spine. (Id. at 167). The ALJ was correct that these medical records are inconsistent with Dr. Kelly's opinion that Plaintiff could only perform extremely sedentary work.

Dr. Kelly's opinion was not supported by any clinical or laboratory diagnostic techniques and instead was based solely on Plaintiff's self-reported limitations. Likewise, Dr. Kelly's opinion is inconsistent with the other medical records and other treating physician opinions. Because Dr. Kelly did not have a continual treating relationship with Plaintiff at the time of his 2006 disability opinion and because his opinion is conclusory and inconsistent with rest of the medical records, the ALJ did not err in giving little weight to Dr. Kelly's opinion. The ALJ's RFC is supported by substantial evidence in the record.

### 3.    Plaintiff's Credibility and Narcotic Use

Plaintiff contends the ALJ erred in discounting his credibility because of his alleged drug-seeking behaviors.  Specifically, Plaintiff contends, "the fact Plaintiff is in need of pain medications to alleviate his symptoms does not justify the ALJ's discounting his credibility or of the opinions of his treating physicians."  (Pl.'s Reply to Def.'s Summ. J. Memo. at 3).  However, settled Eighth Circuit case law provides that an ALJ may consider drug-seeking behavior and malingering in discounting a Plaintiff's credibility.

In the Eighth Circuit, credibility determinations are governed by factors enunciated in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  In assessing subjective complaints, an ALJ must examine several factors:  "(1) the claimant's daily activities; (2) the duration, frequency[,] and intensity of pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions."  Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (citing Polaski, 739 F.2d at 1322).  Other relevant factors are the claimant's work history and the objective medical evidence.  Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999).  "While these considerations must be taken into account, the ALJ's decision need not include a discussion of how every Polaski factor relates to the claimant's credibility."  Casey v. Astrue, 503 F.3d 687, 695 (8th Cir. 2007) (citing Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004)).  An ALJ may discount subjective complaints if they are inconsistent with the evidence as a whole.  Id. (citing Polaski, 739 F.2d at 1322).  Where an ALJ seriously considers, but for good reasons explicitly discredits a plaintiff's subjective complaints, the court will not disturb the ALJ's credibility determination.  Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003); Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).

A claimant's misuse of medications is a valid consideration in an ALJ's credibility determination and drug seeking behaviors can discredit a plaintiff's allegations of disabling pain. Anderson v. Shalala, 51 F.3d 777, 780 (8th Cir. 1995), cited in Anderson v. Barnhart, 344 F.3d 809, 815 (8th Cir. 2003); see also Marrotte v. Barnhart, 107 Fed. Appx. 14, 16, 2004 WL 1809465 (8th Cir. 2004) (upholding ALJ's findings discounting plaintiff's credibility because of record of drug-seeking behavior); Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005) (noting ALJ could properly disbelieve the severity of the plaintiff's complaints because of plaintiff's narcotic addiction). Similarly, while a plaintiff may have a valid need for pain medication, an ALJ may nevertheless consider a plaintiff's overuse of prescribed medications in assessing credibility. Anderson v. Barnhart, 344 F.3d at 815. As the Eighth Circuit stated, "[w]hile we appreciate [the plaintiff's] need for prescribed medications to treat the severe pain . . . we do not think that undercuts the ALJ's finding on [plaintiff's] overuse of medications . . . A claimant's misuse of medications is a valid factor in an ALJ's credibility determinations" Id. Likewise, an ALJ may properly consider whether a plaintiff is malingering or exaggerating his or her symptoms in assessing subjecting complaints of pain. Baker v. Barnhart, 457 F.3d 882, 892 (8th Cir. 2006); Gonzales v. Barnhart, 465 F.3d 890, 895-96 (8th Cir. 2006); Clay, 417 F.3d at 930 n. 2; Jones v. Callahan, 122 F.3d 1148, 1152 (8th Cir. 1997).

The ALJ clearly considered the Polaski factors in analyzing Plaintiff's credibility and subjective complaints of pain. Plaintiff appears to acknowledge that some of his physicians have been concerned with his narcotic use, but he states "none has gone so far as to say that his symptoms are imagined or made up simply to support a drug addiction." (Pl.'s Reply to Def.'s Summ. J. Memo at 3). While Plaintiff's physicians did not suggest he made up his symptoms to support a narcotic addiction, Doctors Brault, Mott, Huntoon and Solberg all questioned or

suggested it was possible Plaintiff was malingering, exaggerating his symptoms, or demonstrating pain-focused behavior.  (See e.g. 478, 459, 634, and 715).  Numerous doctors, including Drs. Mott, Martin, Solberg, and Dennison, expressed concern that Plaintiff was abusing, misusing and/or addicted to narcotics.  (See e.g. 261, 477-78, 644, and 735).  The medical evidence also demonstrates that Plaintiff continually used more pain medications than he was prescribed, and therefore often ran out of medications early.  As the ALJ correctly noted, the record is also replete with evidence of Plaintiff's drug-seeking behavior:  Plaintiff continually asking his providers for more drugs, increased dosages of drugs, or additional drugs; asking for drugs by specific names and doses; getting narcotics from multiple providers at the same time; getting additional narcotics from emergency rooms while under the care of other doctors, taking more of the drugs than he was prescribed; asking for drugs he told other providers did not alleviate his pain; taking his wife's pain medications; and seeking new providers when his doctors expressed concern about his narcotic use or planned to taper him off narcotics.  It is true that a need for strong doses of pain medication can actually support a plaintiff's credibility.  Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir.1998); Preslicka v. Astrue, 07-cv-4237, 2009 WL 490014, *16 (D. Minn. Feb. 26, 2009).  However this case is distinguishable because many doctors, including Drs. Martin, Mott, Mangan, Solberg, recommended Plaintiff taper off his narcotic use.  (See e.g. Admin. R. at 187, 238, 478, 378, 715).

In addition to the narcotic abuse, the ALJ also discounted Plaintiff's credibility because, as set forth above, there is very little objective medical evidence supporting Plaintiff's subjective allegations of pain.  Likewise, the ALJ rejected many of Plaintiff's subjective claims because he did not follow-through with prescribed treatments or tests, such as the 96-hour allergy read or the pain rehabilitation clinic.  The fact that Plaintiff did not follow his doctor's recommendations for

treatment is another factor weighing against Plaintiff's credibility.  <u>Mouser v. Astrue</u>, 545 F.3d 634, 638 (8th Cir. 2008) (citing <u>Kisling v. Chater</u>, 105 F.3d 1255, 1257 (8th Cir. 1997)) (noting plaintiff's failure to quit smoking which caused his COPD was a failure to follow a prescribed treatment); <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 802 (8th Cir. 2005).

The ALJ considered Plaintiff's subjective complaints but found independent reasons, supported by substantial evidence, to discredit those complaints.  The ALJ's determination that Plaintiff's complaints of pain are not totally credible is supported by substantial evidence in the record as a whole.

## IV.    RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff's Motion for Summary Judgment [Docket No. 8] be **DENIED**; and

2.    Defendant's Motion for Summary Judgment [Docket No. 12] be **GRANTED**.


Dated:  June 8, 2009                              s/ Susan Richard Nelson_____
                                                  SUSAN RICHARD NELSON
                                                  United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **June 18, 2009**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.